768 P.2d 1331

STATE of Idaho, Plaintiff–Respondent,

v.

Marvin Dee HEDGER, Defendant–Appellant.

No. 17239.

Supreme Court of Idaho.

Feb. 10, 1989.

Michael J. Wood, Public Defender, Twin Falls, for defendant-appellant.

Jim Jones, Atty. Gen., Boise, for plaintiff-respondent. Deputy Atty. Gen. Michael A. Henderson argued.

BAKES, Justice.

Defendant Marvin D. Hedger (Hedger) appeals from a conviction of rape, second degree kidnapping, aggravated battery and robbery. He seeks either reversal and a new trial due to prejudicial error at trial or

sentence reduction. We affirm the conviction and sentence.

Hedger's crimes stem from events which took place between Hedger and his ex-wife, Donna Hedger (Donna), in the early morning hours of June 10, 1987. Viewing the evidence most favorably in support of the jury's verdict, as we must, *Ross v. Coleman Co., Inc.*, 114 Idaho 817, 761 P.2d 1169 (1988); *State v. Cypher*, 92 Idaho 159, 438 P.2d 904 (1968), the record reflects that Hedger entered Donna's house in Filer without her permission around midnight. Donna awoke to find him standing in her kitchen. He said that "if he couldn't have [her] nobody else would," and then grabbed a knife. Hedger told Donna not to make a noise or he would slit her throat. When he ordered her to take off her pants and she refused, Hedger demanded, "Take your pants off or I will slit your throat and wake the girls [Donna's two daughters, aged 11 and 8] ... and have them watch." She did so and Hedger forced her to have sexual intercourse with him on the floor while holding the knife to her throat. Her neck bore a small cut from the knife.

Hedger then ordered Donna into her car with him. The two children, one of whom was ill, were left alone sleeping in their bedrooms. With Hedger holding a knife to her side, Donna drove to Jackpot, Nevada, as ordered. After passing through Jackpot without stopping, Hedger told Donna to pull into a rest area and get out of the car. She did so. Hedger then held the knife to her back and announced that he would kill her because if he couldn't have her then nobody could. He said he didn't care if he went to prison for life. Donna begged for her life and promised to take him back. Hedger was persuaded by her pleas and threw away the knife. Hedger and Donna returned to her car. He drove them to Twin Falls, stopping once at a service station for oil, cigarettes and soda. To pay for these, Hedger took money from Donna's purse. Hedger got out of the car in Twin Falls, and Donna drove herself home, arriving at 4:35 a.m. Later that day Donna reported the crimes to the police.

I

Hedger raises nine issues on appeal. We consider them in the order presented.

First, Hedger contends the trial court erred by denying his challenge for cause of a prospective juror. Hedger later used a peremptory challenge to dismiss the prospective juror from the jury. The prospective juror in question indicated during *voir dire* that her first husband had been convicted of rape fifteen years earlier, that he was a "bully" who had threatened to kill her, that her current husband had pleaded guilty to sexual abuse three years earlier, and that about five years earlier she worked with a support group for victims of domestic abuse for nearly two years. In response to questions from the trial judge and counsel, the prospective juror stated that she thought she could put aside her prior experiences and fairly judge the case on the facts. Hedger asserts that the juror should have been excused for cause as a matter of law, and that the trial court erred in not excusing her for cause.

It is for the trial court to use its discretion when determining whether a juror can render a fair and impartial verdict. *Quincy v. Joint School Dist. No. 41*, 102 Idaho 764, 640 P.2d 304 (1981); *State v. Rose*, 121 Ariz. 131, 589 P.2d 5 (1978) (*en banc*). For reversal on appeal, Hedger must show an abuse of discretion by the trial court. *State v. Rose, supra; State v. Davis*, 137 Ariz. 551, 672 P.2d 480 (Ct.App. 1983). "When an exercise of discretion is reviewed on appeal, the appellate court conducts a multi-tiered inquiry. The sequence of the inquiry is (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason." *Associates Northwest, Inc. v. Beets*, 112 Idaho 603, 605, 733 P.2d 824, 826 (Ct.App.1987). Here, the trial court applied the applicable law and con-

cluded that "notwithstanding her past experience, [the prospective juror] has given every indication that she can decide this case on its merits and will attempt to do so." Accordingly, there has been no showing of an abuse of discretion and no error. *Associates Northwest, Inc. v. Beets, supra.*

## II

■ Second, Hedger contends the trial court erred in allowing a minister, Jim Sommer, to testify concerning an alleged privileged conversation that he had with Hedger three days before the rape. Sommer testified that immediately following the morning service on Sunday, June 7, 1987, Hedger approached him. Sommer indicated that "many people were hanging around as they usually do, and we [Sommer and Hedger] talked with quite a number of people." Another man, Craig Shepherd, was present when Hedger told Sommer that he "was really hurting and that he couldn't live without Donna." Though this comment was not addressed specifically to Shepherd, he was still within hearing distance. The record supports the trial court's finding that the conversation had not taken place in private and therefore was not a privileged confidential communication protected by I.R.E. 505.

## III

Third, Hedger contends a reference in the testimony of the victim, Donna Hedger, that Hedger had been in jail, was reversible error and that the trial court erred by denying Hedger's motion for mistrial. At trial, Donna was questioned about her locking up doors and windows:

"Q. [By the prosecutor] ... When you went to bed that night, do you know whether or not the doors and windows were locked?

"A. [By Donna] Yes, they were.

"Q. How do you know that?

"A. I made double sure since the time Marvin had gotten out of jail.

"Q. So it was part of your nightly routine?

"A. Yes.

"Q. When was it Marvin got out of jail?

"A. He got out of jail on a Tuesday, the Tuesday before the 9th. It was on a Tuesday that he had gotten out."

At this point Hedger's counsel objected, and the trial court promptly struck Donna's references and instructed the jury to disregard them. Hedger's motion for mistrial was denied, however.

■ On appeal, Hedger has the burden of showing that the trial court's refusal to declare a mistrial constituted reversible error. *State v. Ellis,* 99 Idaho 606, 586 P.2d 1050 (1978); *State v. Urquhart,* 105 Idaho 92, 665 P.2d 1102 (Ct.App.1983). Where, as here, improper testimony inadvertently arises and the trial court promptly instructs the jury to disregard the evidence, it must be presumed that the jury obeyed the trial court's direction entirely. *State v. Rolfe,* 92 Idaho 467, 444 P.2d 428 (1968); *State v. Boothe,* 103 Idaho 187, 646 P.2d 429 (Ct.App.1982). We note that on cross examination Hedger himself admitted that he had twice been convicted of burglary. We find that when viewed within the context of the full record, there was no error in the trial court's handling of the issue, nor any reasonable possibility that Donna's references contributed to Hedger's conviction. The references, even if error, were harmless. *State v. Rodriquez,* 106 Idaho 30, 674 P.2d 1029 (Ct.App.1983). Accordingly, the trial court's refusal to grant a mistrial is affirmed.

## IV

■ Fourth, Hedger contends the trial court erred by refusing to exclude as inadmissible character evidence testimony from Ruth Massie, Donna's sister. Massie testified that in her opinion Donna would not have left the children alone at night. Hedger characterizes Massie's testimony as inadmissible under I.R.E. 404 because it is being offered to prove that Donna acted

in conformity with a character trait—being a good mother who would never voluntarily leave her children alone at night. The state responds that Massie's testimony is admissible under I.R.E. 406 because it refers to Donna's habit and Donna's way of dealing with her children in a particular situation, which may be considered as a habit. *State v. Murray*, 741 P.2d 759 (Mont.1987); *State v. Sigler*, 688 P.2d 749 (Mont.1984).

The testimony referred to Donna's practice, although the concluding question was framed with reference to an *opinion:*

"Q. [By the prosecutor] Mrs. Massie, are you close to your sister?

"A. Yes.

"Q. Have you ever had occasion to care for her children in her absence?

"A. Yes.

"Q. Have you ever had to care for her children late at night?

"A. Not late at night. I mean, not like after midnight or anything. But later in the evening, yes.

"Q. If Donna has to be somewhere late at night, does she make arrangements with you to care for her children?

"A. Yes, she does.

"Q. Knowing Donna as you do, in your opinion would she have left her children alone for four hours from midnight to 4:00 o'clock?

. . . .

"A. No."

Hedger objected only to this last question.

We note that later in the trial the prosecutor elicited similar testimony from Donna's mother, Betty Haman, concerning Donna's habits relating to leaving her children alone at night. Mrs. Haman was asked a similar concluding question: "In your opinion would [Donna] have voluntarily left her children alone in that house between midnight and 4:00 o'clock in the morning?" Mrs. Haman responded, "No." Hedger did not object to this testimony.

We conclude that the trial court did not err in denying Hedger's objection to the last question posed to Massie. Under the circumstances, the question could reasonably have been perceived by the witness and jurors as pertaining to Donna's habits in making arrangements for her children when she left them at night, which was the subject of the preceding questions, and not with her general character trait for being a good mother.

V

■ Fifth, Hedger contends the trial court erred by excluding defense Exhibit 60, a transcribed but unsigned portion of a taped interview on September 15, 1987, between defense counsel and Donna. The subject of the interview was whether Hedger left the keys in the car while at the service station, thereby arguably giving Donna opportunity to escape. At trial, defense counsel questioned Donna about the interview and the placement of the car keys:

"Q. [By defense counsel] And wouldn't the keys be right on the steering column, on the right side of the steering column there?

"A. [By Donna] Yes.

"Q. And they would have been, what, maybe two feet away from you?

"A. Yes.

"Q. And it's your testimony to this jury that while Marvin Hedger left you alone in that vehicle you didn't even check to see if the keys were in it?

"A. No I didn't.

"Q. Again referring you to the interview that I did with you on September 15th of this year, didn't I ask you, 'So there was no article in the car that Marvin took with him when he climbed out at the service station?' And your answer was, 'Other than the keys?' And I said, 'Anything. Did he take the car keys?' And your response was, 'Yeah, he took the car keys. And there wasn't anything else in the car.' Wasn't that what you told me during that September 15th interview?

"A. I suppose so. I don't remember what I said to you.

"Q. You don't deny that's what you told me during that interview?

"A. No, I don't deny it.

"Q. But you can't say that it was what you told me?

"A. Very truthfully, no, I can't say that either."

Defense counsel then sought to introduce a copy of the foregoing transcribed portion of the taped interview as evidence of a prior statement inconsistent with Donna's testimony at trial. The trial court refused, stating that the jury had already been orally presented with the statement and to admit the typed portion would unduly emphasize one portion of the witness's testimony over other portions. Hedger primarily argues that the typed copy was admissible to impeach her testimony by showing her to be either untruthful, or at least inconsistent. However, as the state points out in its brief:

> "During closing arguments, defense counsel was able to tell the jury that Mrs. Hedger had made the inconsistent statement, that she had admitted making the statement, and that the court had found that she admitted making the statement. ... Further, the prosecuting attorney conceded during her final closing argument that Mrs. Hedger had made the inconsistent statement."

Defense counsel was able to make as full use of the inconsistent statement as he would have if the transcript had been admitted. Accordingly, the trial court committed no error on this issue.

### VI

Sixth, Hedger contends the trial court erred by allowing the state to present opinion testimony as to his truthfulness and honesty. The testimony came from the minister, Sommer, and Peter Magnusson, an outpatient counselor at a substance abuse treatment facility, and was offered on rebuttal after Hedger testified. Hedger asserts that these witnesses should not have been permitted to offer their opinions because their opinions were the product of privileged relationships and should be excluded under I.R.E. 505, the religious privilege, and I.R.E. 517, the licensed counselor-client privilege. These privileges apply to confidential communications. At trial, Hedger made no showing of any confidential communications with either Sommer or Magnusson upon which to base a privilege. On that basis the trial court overruled Hedger's objections to the witnesses' testimony. We affirm the trial court on this issue.

### VII

Seventh, Hedger contends the trial court erred by allowing three state rebuttal witnesses, Sommer, Magnusson and Sandy Crosby, Hedger's niece, to offer opinions as to Hedger's truthfulness and honesty. Hedger asserts that under I.R.E. 608(a) the three witnesses could only give their opinion of Hedger's *truthfulness*, not his honesty. We disagree. "Truthfulness" and "honesty" are, by most dictionary definitions, synonymous:

> "honesty ... adherence to facts: freedom from subterfuge or duplicity: TRUTHFULNESS, SINCERITY ..."

> "truth ... sincerity in character, action, and speech: genuineness in expressing feeling or belief: TRUTHFULNESS, HONESTY...." Webster's Third New International Dictionary, 1086, 2457 (1971).

Accordingly, the trial court did not err on this issue.

### VIII

Eighth, Hedger contends that the cumulative effect of error committed by the trial court deprived him of a fair trial. Because we find no error below, the doctrine of "cumulative error" is inappropriate. *State v. Buzzard,* 110 Idaho 800, 718 P.2d 1238 (Ct.App.1986); *State v. Campbell,* 104 Idaho 705, 662 P.2d 1149 (Ct.App.1983).

## IX

Finally, Hedger contends that the trial court abused its discretion by sentencing him to an excessive term of confinement. The trial court imposed the following concurrent sentences: fifteen to thirty years for rape; ten to twenty years for second degree kidnapping; ten to fifteen years for aggravated battery; and five to ten years for robbery. Hedger asserts that the minimum term should be reduced to five years.

 Absent a showing of a clear abuse of discretion, a sentence within statutory limits will not be disturbed on appeal. *State v. Major*, 105 Idaho 4, 665 P.2d 703 (1983); *State v. McPhie*, 104 Idaho 652, 662 P.2d 233 (1983); *State v. Couch*, 103 Idaho 496, 650 P.2d 638 (1982). Hedger's sentence was within statutory limits. We have independently examined the record with regard to the nature of the offenses, the character of the offender, and the protection of the public interest. In view of the severe nature of the crimes and Hedger's abysmal prior record, including several burglary convictions, we hold that the sentence imposed was not an abuse of the court's discretion. *State v. Shideler*, 103 Idaho 593, 651 P.2d 527 (1982); *State v. Reinke*, 103 Idaho 771, 653 P.2d 1183 (Ct. App.1982). Accordingly, the trial court is affirmed on this issue.

We affirm the conviction and sentence.

SHEPARD, C.J., and HUNTLEY and JOHNSON, JJ., concur.

BISTLINE, Justice, dissenting.

The majority opinion is long on conclusions and short on analysis. Specifically, I disagree with the majority's handling of the clergy privilege, habit evidence, inconsistent statement and cumulative error issues. Each will be addressed in turn.

## A. PRIVILEGED CONVERSATION WITH THE MINISTER

The majority holds that because other persons were in close proximity to the minister and Hedger, his statement was not privileged. Hedger stated that he "could not live without [ex-wife] Donna, that if he couldn't have Donna neither could anyone else." Tr., Vol. II, at 242. A reasonable juror could conclude that such a statement provides a motive. It is prejudicial and highly damaging, but inadmissible under I.R.E. 505.

Idaho Rule of Evidence 505, the religious privilege, provides in part: "Confidential communication. A communication is 'confidential' if made *privately and not intended for further disclosure* except to other persons present in furtherance of the purpose of the communication." (Emphasis added.) The majority of necessity interprets the rule too broadly. In my view a statement can be made "privately and not intended for further disclosure" when other people are around. Otherwise the whisperings of Ollie North to defense counsel Brendan Sullivan at the Iran–Contra pretrial hearings would not be protected by the attorney-client privilege.

## B. HABIT TESTIMONY

The majority opinion concludes that Donna's sister could properly testify that Donna would not have left her children alone at night because it constitutes admissible habit testimony. *Maj. op.* at 601–602, 768 P.2d at 1334–1335. The terse analysis fails to define habit evidence, character evidence and the important—and often confusing—interplay between the two.

Idaho Rule of Evidence 406 provides:

**Habit; routine practice.**—Evidence of a habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Rule 406 clearly states habit testimony is admissible, but it does not define it. Sound jurisprudence demands that we look else-

where for a definition, therefore, and not simply permit the admission of any claimed habit evidence.

Professor McCormick, in his leading evidence treatise writes:

> Character and habit are close akin. Character is a generalized description of one's disposition, or of one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness. 'Habit,' in modern usage, both lay and psychological, is more specific. It describes one's regular response to a repeated specific situation. If we speak of character for care, we think of the person's tendency to act prudently in all the varying situations of life, in business, *family life*, in handling automobiles and in walking across the street. A habit, on the other hand, is the person's regular practice of meeting a particular kind of situation with a *specific type of conduct*, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand signal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic.

McCormick, *On Evidence* § 195, at 462–63 (2d ed. 1972) (footnotes omitted) (emphasis added).

Thus, according to Professor McCormick, evidence which establishes that an individual has the tendency to act prudently in "family life," such as the way in which a mother cares for her children, is evidence of *character*, not *habit.* As the Twin Falls public defender has argued throughout, the evidence, therefore, is inadmissible under I.R.E. 404 (character evidence not admissible to prove conduct).

Furthermore, the testimony of the sister lacks a sufficient foundation to qualify as habit testimony. The trial testimony of the sister provides:

Q. If Donna has to be somewhere late at night, does she make arrangements with you to care for her children?

A. Yes, she does.

Q. Have you ever had to care for her children late at night?

A. Not late at night. I mean, not like after midnight or anything. But later in the evening, yes.

*Maj. op.*, at 602, 768 P.2d at 1335. No testimony establishes that Donna made arrangements for the care of the children on more than one occasion. As the above quote from Professor McCormick teaches, a habit is a person's *regular* practice of meeting a particular kind of situation with a *specific* type of conduct.

Unmentioned by the majority is *Petricevich v. Salmon River Canal Co.*, 92 Idaho 865, 452 P.2d 362 (1969) wherein plaintiff sued a canal company for allegedly burning a fence, which in turn allowed a bull to roam at large; plaintiff's automobile collided with the wandering bull on U.S. Highway 93. Testimony of one witness provided that the canal company burned "every fence crossing it came to." *Id.* at 869, 452 P.2d at 366. Plaintiff argued that such testimony was admissible evidence of habit. The Court held, however, that the record failed to establish enough specific instances to base an inference of systematic conduct:

> In the present case there is no indication of how many times the respondent allegedly burned down Mr. Loughmiller's fences. Neither is there any showing of similar circumstances so as to give a basis for an inference that the burned fences are a regular response to a given situation.

*Id.* at 870, 452 P.2d at 367.

Similarly, the record in this case fails to establish enough specific instances to base an inference of systematic conduct. We are left to speculate as to how many times the sister took care of the children or how many times the sister knew others did. *See also, Denbeigh v. Oregon Washington R.R. & Navigation Co.*, 23 Idaho 663, 132 P. 112 (1913) (engineer's reputation as a careful and prudent engineer inadmissible to establish that he acted in accordance with that reputation at time of accident); *Rumple v. Oregon Short Line Ry. Co.*, 4

Idaho 13, 35 P. 700 (1894) (proof that railroad company blockaded streets of Nampa at any other time does not prove, nor tend to prove, that street was blockaded at time of accident).

Bypassing all Idaho precedent, the majority cites two Montana cases as its only authority. They, however, do not support the conclusion that the sister's testimony established evidence of a habit.

> Habit or routine practice may be proved by testimony in the form of an opinion or by *specific instances of conduct* sufficient in number to warrant a finding that the habit existed or that the practice was routine.

*State v. Murray*, 741 P.2d 759, 763 (Mont. 1987) (emphasis added) (quoting *State v. Silger*, 210 Mont. 248, 688 P.2d 749, 752–53 (1984)). In *Murray* the court listed seven prior uniform instances of conduct to establish habit. 741 P.2d at 763. All that can be said of the instant case is that the sister's opinion was that Donna takes care of her children. Untold is upon what specific conduct the sister bases her opinion. It walks, swims, flies, and quacks like inadmissible character evidence, but the majority concludes habit is established.

### C. THE PRIOR INCONSISTENT STATEMENT

Defense counsel sought to introduce a transcript of Donna's pretrial interview in which she stated appellant took the car keys out of the car while at the gas station. At trial she stated she did not know if the keys were in the car and she did not check to see if they were in the ignition.

Appellant's theory of defense was that Donna took the trip to Nevada of her own volition; if Donna was kidnapped, she would have exercised an easy means of escape. Thus, the crux of the trial centered on whose testimony was believable.

The majority reasons that appellant has no cause for error because defense counsel was able to tell the jury of the inconsistent statement. Thus, so the majority concludes, "[d]efense counsel was able to make full use of the inconsistent statement as he would have if the transcript had been admitted." Maj. op. at 603, 768 P.2d at 1336. This is, of course, untrue. Defense counsel was *not* permitted to submit the pertinent portion of the transcript to the jury. Without question the transcript containing the prior inconsistent statement was admissible. *See* I.R.E. 613. The State concedes that the prior inconsistent statement was admissible, but the error (if any) was harmless. Respondent's Brief at 35–36.

The best rule is: when in doubt, let the admissible evidence proffered by a criminal defendant be submitted to the jury to establish a prior inconsistent statement. This is especially true, as here, when the case is decided not on demonstrative evidence, but the veracity of witnesses. Otherwise, defendants get a resounding message that the mechanism by which their future is decided is nothing but a cold machine. As stated previously:

> 'Assembly line' justice is inconsistent with the Idaho criminal system. Otherwise, '[s]uddenly it becomes clear that for most defendants in the criminal process, there is scant regard for them as individuals. They are numbers on dockets, faceless ones to be processed and sent on their way.' *Asgersinger v. Hamlin*, 407 U.S. 25, 35, 92 S.Ct. 2006, 2011, 32 L.Ed.2d 530 (1972). Hobbling a willing public servant such as the public defender would be admirable if mere efficiency of disposition was the goal. However, we should avoid the false economy of the assembly line which elevates efficiency over justice.

*State v. Elisondo*, 114 Idaho 412, 426, 757 P.2d 675, 689 (1988) (Bistline, J., concurring).

### D. CUMULATIVE ERROR

The majority concludes that because this was an error-free trial, the "cumulative error" doctrine is inappropriate. However, the (1) improper clergy testimony, (2) the

inadmissible character evidence, and (3) prohibited use of the admissible prior consistent statement convinces me the doctrine is applicable. While each of these errors may not be grounds for reversal in and of themselves, combined they convince me a new trial is warranted.