817 P.2d 646

**STATE of Idaho, Plaintiff–Respondent,**

v.

**William F. DAMBRELL, George T. Gabourie, Defendants–Appellants.**

Nos. 17619, 17647, 17852, 18604 and 18687.

Supreme Court of Idaho, Lewiston, April 1991 Term.

Aug. 19, 1991.

Lempesis & Kroeger, P.A., Post Falls, for defendant-appellant Dambrell.

Fred Gabourie, Sr., and Charles B. Lempesis, argued, for defendant-appellant Gabourie.

Larry J. EchoHawk, Atty. Gen., Michael J. Kane, Deputy Atty. Gen., argued, Boise, for plaintiff-respondent.

JOHNSON, Justice.

This is a homicide case. Several issues are presented:

1. Were the defendants denied a fair trial because there were no American Indians on the jury panel and because the trial court denied their motion for change of venue?

 We hold that the defendants did not present a prima facie showing of a violation of the "fair-cross-section" requirement of the sixth amendment and that the trial court did not abuse its discretion in denying the motion for change of venue.

2. Did the trial court impermissibly deny the defendants' motion to sever their cases?

 We hold that the trial court did not abuse its discretion in denying the motion.

3. Should the prosecutor's office have been recused from participation in the case?

We hold that the trial court took adequate precautions to avoid any prejudice caused when one of the defense attorneys became associated with the civil division of the prosecutor's office.

4. Should the trial court have given a "theory of the defense" jury instruction?

We hold that the trial court acted correctly in not giving the requested instruction.

5. Did the jury engage in misconduct by (a) deliberating late into the night and (b) by giving undue consideration to the fact that the defendants exercised their right not to testify?

We hold that the jury did not engage in misconduct.

6. Should evidence of the victim's bad character, especially any propensity for violence, have been allowed?

We hold that the defendants did not preserve this issue for appeal, because no evidence of the victim's bad character, or propensity for violence was offered by the defendants.

7. Is the involuntary manslaughter conviction of one co-defendant inconsistent with the second-degree murder conviction of the other co-defendant?

We hold that there was a rational basis for any perceived inconsistency between the two verdicts.

8. Should a new trial have been granted in light of newly discovered evidence?

We hold that the trial court did not abuse its discretion in finding that the newly discovered evidence would probably not have produced an acquittal in a new trial.

I.

THE BACKGROUND AND PRIOR PROCEEDINGS.

In July, 1987, James Seagoe was shot and killed after entering a residence in Coeur d'Alene, Idaho, where he had gone with two other individuals to collect the amount owed for a drug transaction. William F. Dambrell and George T. Gabourie were in the residence when Seagoe forced his way in. Dambrell was armed with a shotgun and Gabourie was armed with a handgun. As Seagoe entered a hallway and turned a corner, Dambrell fired the shotgun at Seagoe, causing only superficial wounds that did not cause Seagoe's death. Seagoe was then shot in the back of the head with a .38 caliber handgun. One witness testified she heard the boom of the shotgun and then three other pops. Seagoe was killed by one .38 caliber slug that was recovered from his brain.

Dambrell and Gabourie left the residence and drove away with another individual. Dambrell and Gabourie were later arrested and charged separately with the first-degree murder of Seagoe. The charges alleged that Dambrell shot Seagoe in the abdomen with a shotgun before Gabourie shot Seagoe in the head with a revolver. The charges alleged that Dambrell and Gabourie each "did wilfully, unlawfully, deliberately and with premeditation, and with malice aforethought, kill and murder James Seagoe." Dambrell and Gabourie were each alleged to be the accomplice of the other.

The trial court granted the prosecutor's motion to consolidate the two cases. Dambrell and Gabourie moved to sever their cases for trial, for a change of venue, and to recuse the prosecuting attorney because one of the defense attorneys had become a deputy in the civil division of the prosecutor's office. The trial court denied these motions.

During jury selection, defense counsel moved to quash the jury panel on the ground that there were no American Indians included on the panel. The trial court also denied this motion.

As part of the prosecution's case at trial, Seagoe's wife testified concerning Seagoe's academic record, his intelligence, sports record, ability with horses, and desire to alter his use of drugs. The defense attorneys moved to strike this testimony on the grounds that it was impermissible evidence of good character. Before the trial court ruled on this motion, defense counsel withdrew the motion. During the cross-examination of Seagoe's wife, Dambrell's attor-

ney asked her if she feared Seagoe was going to hurt her. She answered that she never feared Seagoe. Dambrell's attorney also asked Mrs. Seagoe whether she had a fear that Seagoe was going to try to hurt her mother. The trial court sustained the prosecutor's objection to this question. Thereafter, defense counsel did not offer any evidence of Seagoe's bad character or of his propensity for violence.

Neither Dambrell nor Gabourie testified at the trial. The trial court instructed the jury that the jury must not draw any inference of guilt from the fact that a defendant did not testify, nor should the fact a defendant did not testify be discussed by the jury or enter into the jury's deliberations in any way.

Defense counsel requested that the trial court instruct the jury, as follows:

In determining, whether in regard to premeditation and deliberation, reasonable doubt exists, as that term has been previously defined, you may consider any of the following evidence:

1. Lack of Motive;
2. James Seagoe, Ron Morrazzo and Chief Coleman approached the home of Kim Stroud in a menacing and threatening manner and armed with guns;
3. James Seagoe, armed with a gun, pushed Kim Stroud aside and without permission or legal justification forced entry into the house;
4. George T. Gabourie and William Dambrell had a legal right to and were inside the residence of Kim Stroud with her permission;
5. Any other evidence tending to prove reasonable doubt.

The trial court rejected this requested instruction on the ground that it was covered by other instructions. Among the instructions given by the trial court to the jury was one describing the defense of justifiable homicide, one describing the justifiable use of deadly force, and one describing the meaning of reasonable doubt.

The jury retired to deliberate at 1:25 p.m. on March 31, 1988. That same day, the jury had lunch brought in and then went out to dinner about 6:00 p.m. The jury then continued its deliberations until 4:45 a.m. on April 1, 1988, when the trial court inquired whether or not the jury wanted to continue to deliberate or to take a rest. At the request of the jury, a recess was called and the jury was sent to a motel. The jury resumed its deliberations at about 11:00 a.m. that same day and returned its verdicts at 6:20 p.m. The jury found Gabourie guilty of second-degree murder and Dambrell guilty of involuntary manslaughter.

After the trial, Dambrell and Gabourie moved for a judgment of acquittal based, in part, on the assertion that the verdict that Gabourie was guilty of second-degree murder and the verdict that Dambrell was guilty of involuntary manslaughter were inconsistent. Dambrell and Gabourie also moved for a new trial on the basis of newly discovered evidence in the form of a .38 caliber revolver that was delivered to the office of Gabourie's former attorney after the trial. The trial court denied both of these motions.

The trial court entered judgments convicting Gabourie of second-degree murder and convicting Dambrell of involuntary manslaughter. Both were sentenced and have now appealed their convictions.

## II.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE MOTION TO QUASH THE JURY PANEL AND IN NOT GRANTING THE MOTION FOR CHANGE OF VENUE.

Dambrell and Gabourie assert that they are American Indians and were denied a fair trial because American Indians were underrepresented on the jury panel from which the jury that tried them was selected. They also assert that the trial court should have granted their motion for change of venue to Benewah County where a greater proportion of the population is American Indian and where prejudicial pretrial publicity would not have prevented them from receiving a fair trial. We disagree with both of these assertions.

In *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the United States Supreme Court stated the requirements for a prima facie showing of the "fair-cross-section" requirement of the sixth amendment. A defendant must show "(1) that the group alleged to be excluded is a 'distinctive group' in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." 439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 587. This test was applied by this Court in *State v. Paz,* 118 Idaho 542, 548–50, 798 P.2d 1, 7–9 (1990).

Dambrell and Gabourie did not offer any information concerning parts (2) and (3) of the *Duren* test. Their motion for change of venue merely alleged:

3. According to the 1980 United States Census only 1.1% of the adult population, those eighteen and over, are American Indians in the State of Idaho and has determined that American Indians are significantly underrepresented in the census in Kootenai County, *i.e.,* .77%.

4. In conjunction with and as a condition to defendants' motion for a change of venue from Kootenai County, defendants' further moves the Court to *remove this criminal action to BENE-WAH COUNTY,* which is the only convenient venue where defendants have any likelihood of obtaining a fair and impartial trial, American Indian population is 5.3%.

(Emphasis in original.) A supplemental documentation in support of the motion demonstrated that there were approximately 60,000 people in Kootenai County in 1980.

In their motion to quash the jury panel, Dambrell and Gabourie realleged these facts together with the fact that American Indians comprised 1.1% of the population of the First Judicial District and the fact that there were no American Indians on the jury panel of sixty-nine. They also alleged that potential jurors in Kootenai County are chosen from voter registration lists and driver license lists.

The facts alleged by Dambrell and Gabourie do not support a conclusion that the representation of American Indians in venires from which juries are selected in Kootenai County is not fair and reasonable in relation to the number of American Indians in Kootenai County. Also, there is no allegation that if there were an underrepresentation it was due to systematic exclusion of American Indians in the jury selection process. Using the facts alleged by Dambrell and Gabourie, it was statistically unlikely that any of the American Indians, who make up only .77% of the population of Kootenai County, would be present on a jury panel of 69 out of a population of approximately 60,000.

■ Dambrell and Gabourie really complain that there is not a sufficient pool of potential American Indian jurors in Kootenai County to make it likely that there will be American Indians on a jury panel of less than 462 members. (.0077 × 60,000 = 462). The guarantee of the sixth amendment is not that each racial or ethnic group present in the community be represented on each jury panel, but only that there be a fair cross-section of the community. The composition of the jury panel in this case did not violate this requirement.

■ Dambrell and Gabourie also sought a change of venue based on prejudicial pretrial publicity in Kootenai County. The trial court reserved a ruling on this part of the motion, pending attempts to select a jury in Kootenai County. Voir dire allowed counsel to question the impact of any pretrial publicity on the fairness and impartiality of the prospective jurors. Dambrell and Gabourie did not challenge for cause any of the jurors who served in this case nor did they reassert or ask the trial court to rule on the motion for change of venue during or after the voir dire. The trial court did not abuse its discretion in not granting a change of venue. *See State v. Fetterly,* 109 Idaho 766, 769, 710 P.2d 1202, 1205 (1986).

## III.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE MOTION TO SEVER.

Dambrell and Gabourie assert that the trial court should have severed their cases and given them separate trials on the grounds that their defenses were inconsistent and antagonistic. We disagree.

I.C.R. 8(b) allows two or more defendants to be joined for trial "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." I.C.R. 13 allows the trial court to order that two or more defendants be tried together if they could have been joined in a single information. I.C.R. 14 provides that if a defendant is prejudiced by joinder of defendants for trial, the trial court may grant separate trials. Dambrell and Gabourie had the burden of showing prejudicial joinder. *See State v. Caudill,* 109 Idaho 222, 226, 706 P.2d 456, 460 (1985); *State v. Cochran,* 97 Idaho 71, 74, 539 P.2d 999, 1002 (1975).

A motion to sever is directed to the trial court's discretion, and we will not overturn a denial of the motion unless the trial court has abused its discretion. *State v. Abel,* 104 Idaho 865, 867-70, 664 P.2d 772, 774-77 (1983). We will not rule that a trial court has abused its discretion if (1) the trial court correctly perceived the issue as one of discretion, (2) the trial court acted within the outer boundaries of its discretion and consistently with any legal standards applicable to specific choices, and (3) the trial court reached its decision by an exercise of reason. *State v. Hedger,* 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

Although Dambrell and Gabourie argued to the trial court that they were prejudiced by their joinder, the trial court did not abuse its discretion in denying the motion. Dambrell and Gabourie contended that their defenses were inconsistent and antagonistic. In denying the motion, the trial court focused on the joint motions that the defendants had made and the joint strategy and joint defense sessions defense counsel had conducted. The trial court ruled that there was not a sufficient showing of antagonistic defenses to require severance. After the trial, the trial court noted:

> In retrospect, it is clear to the court that the defendants' theories of the case were the same, that there was a high degree of cooperation and collaboration between both the defendants and their respective counsel, and not the slightest antagonism, actual or theoretical existed between the defendants.

At oral argument before this Court, counsel for Dambrell contended that the joinder made it impossible for Gabourie to assert a defense of post-traumatic stress disorder (PTSD) caused by his service as a member of the armed forces in Vietnam. Dambrell's attorney argued that if Gabourie had pursued the defense of PTSD, this would have opened up Gabourie's prior history, including his prior conviction for voluntary manslaughter in California and that this would have been prejudicial to Dambrell's assertion that he and Gabourie acted in self-defense.

Prior to trial, the trial court appointed a psychiatrist and a psychologist to examine Gabourie. The reports from these experts revealed that Gabourie did suffer from PTSD. On the same day that the trial court ordered examination of Gabourie by a psychiatrist and a psychologist, Dambrell's attorney renewed the motion to sever. In arguing this renewed motion, Dambrell's attorney referred to "an affidavit in the Court's file giving grave concern on behalf of Defense Counsel about the competing defense theories and strategies." Dambrell's attorney then referred to the appointment of a psychiatrist and a psychologist and said:

> That was previously addressed in the affidavit. They are not only inconsistent defenses, but competing theories. And I previously addressed that to the Court, but I think it's strengthened and highlighted by this morning's motions and findings of the Courts made appointment.

We have reviewed the affidavit, which is part of the record here. This affidavit

makes it clear that the trial court had been notified that Gabourie might assert a PTSD defense, depending on the results of the examinations by the psychiatrist and the psychologist appointed by the trial court. The trial court denied the renewed motion to sever on the day it was made, stating that there was no showing of antagonistic defenses.

There is no indication in the record that after the reports of the psychiatrist and the psychologist were made, Gabourie indicated to the trial court an intention to pursue the PTSD defense. Gabourie's defense at trial did not refer to his PTSD. Gabourie's attorney made an opening statement before the prosecution presented its case-in-chief. This statement indicated that Gabourie would testify that he fired a .38 caliber handgun on the occasion in question, but not at Seagoe. Gabourie's attorney also referred to self-defense in this opening statement and the thrust of Gabourie's defense was that Dambrell and Gabourie acted in self-defense and that a third party fired the shot that killed Seagoe. Gabourie did not testify during the trial.

In its denials of the motion to sever, the trial court correctly perceived that the decision on the motion was a discretionary one. The trial court acted within the boundaries of its discretion. Its decision was not inconsistent with the legal standard applicable to the choices it had to make. The trial court reached its decision by an exercise of reason. Therefore, we conclude that the trial court did not abuse its discretion in denying the motion to sever on the ground that the defendants had not asserted sufficiently antagonistic defenses to make it prejudicial to try them together.

Counsel for Dambrell also argued before this Court that neither defendant could testify at trial because Gabourie intended to deny that he had a weapon and Dambrell would have testified that Gabourie had a .38 caliber handgun. This theory is belied by the opening statement of Gabourie's attorney, who told the jury that Gabourie would testify that he had a .38 caliber handgun on the occasion in question.

In their motion to sever, Dambrell and Gabourie contended that in a joint trial one of them might produce evidence that incriminated the other. The motion stated:

Although the nontestifying defense can cross-examine the co-defendant on those portions of the testimony that incriminate him, the testifying defendant is forced to confront two cross-examiners— the State and his co-defendant. This is to say nothing of the possibility of prejudice to the cross-examiner who may subject the other to a vigorous cross-examination.

In the converse situation, where defendants who were joined for trial wished to testify on their own behalf and to have their co-defendants also testify for them, the Court has ruled that it was not an abuse of discretion for the trial court to deny a motion to sever. *State v. Owen*, 73 Idaho 394, 420, 253 P.2d 203, 219 (1953); *State v. Fox*, 52 Idaho 474, 483–84, 16 P.2d 663, 667 (1932); *State v. Allen*, 23 Idaho 772, 778, 131 P. 1112, 1114 (1913). In the absence of some specific showing of prejudice beyond Dambrell's and Gabourie's general assertion in their motion to sever, we conclude that the trial court did not abuse its discretion in denying their motion on this ground.

In his brief to this Court, Gabourie makes the additional argument that his joint trial with Dambrell impermissibly tainted him with Dambrell's actions. We disagree. Since Gabourie was convicted of the more serious offense, and since it is undisputed that Dambrell's shotgun blast did not kill Seagoe, the taint, if any, was against Dambrell and not Gabourie.

## IV.

THE TRIAL COURT TOOK ADEQUATE PRECAUTIONS TO AVOID ANY PREJUDICE WHEN ONE OF THE DEFENSE ATTORNEYS JOINED THE PROSECUTOR'S OFFICE AS A CIVIL DEPUTY.

Dambrell and Gabourie assert that the trial court should have recused the prosecutor's office from prosecuting these

cases because one of the defense attorneys became a civil deputy in the prosecutor's office during the prosecutions. While we are concerned about the appearance of impropriety caused by this situation, we conclude that the trial court took adequate precautions to avoid any prejudice to the defendants.

The attorney in question assisted in representing Dambrell during the early stages of the prosecution. The attorney was present at the initial interview of Dambrell in the county jail, present during strategy conferences involving Dambrell's other two defense lawyers and appeared in court representing Dambrell during a motion to withdraw filed by Gabourie's former counsel. Approximately two months before trial, the attorney was appointed as a deputy prosecuting attorney for Kootenai County and assigned to the civil division under the direct supervision of the chief civil deputy prosecuting attorney.

When Dambrell expressed concern that the attorney's change of employment would affect the fairness of the trial, the attorney was called to testify. The attorney testified that he had not discussed the Dambrell matter with the prosecutor or anyone on the prosecutor's staff. The attorney represented to the trial court that he would have no involvement whatsoever in the Dambrell case or any other criminal matter while employed by the prosecutor's office.

At the conclusion of the hearing, the trial court entered an order directing the attorney not to discuss any criminal proceedings in which he had participated or of which he had knowledge with any person while he was employed by the prosecutor's office. The trial court also ordered that the prosecutor issue and file with the trial court a written instruction directing the prosecutor's staff not to discuss any pending criminal proceedings, including but not limited to this one, with the attorney. The trial court ordered the prosecutor to file statements with the court from each member of the prosecutor's staff indicating receipt of this instruction. The trial court also ordered the prosecutor to file similar statements from the police and governmental agencies involved in the case. These statements were filed with the trial court.

Before trial, Dambrell and Gabourie filed a motion to recuse the prosecutor and to appoint a special prosecutor, or in the alternative, to dismiss the case. The defendants based this motion on what they described as a "legitimate and detrimental 'chilling effect'" on the confidential communications between themselves and their attorneys. They asserted violations of the fifth, sixth, and fourteenth amendments to the United States Constitution. In denying the motion, the trial court noted that the allegations of impropriety and prejudice were not supported and did not rise to a constitutional level and that the trial court's order provided safeguards to insure that no confidences were breached.

While the appearance of impropriety produced by this situation is of concern to us, in the absence of proof of prejudice to the defendants, we are not prepared to rule that the trial court abused its discretion in denying the motion. *See, State v. Gibson*, 106 Idaho 54, 58, 675 P.2d 33, *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984). We do, however, caution defense attorneys and prosecutors that this type of employment change during a serious criminal prosecution will cause us to look closely at the record in future cases, as we have here, to discern whether any prejudice occurred. We note in passing that the obvious solution to the problem would have been for the attorney to have delayed his employment with the prosecutor's office until the Dambrell case was resolved.

### V.

### THE TRIAL COURT WAS CORRECT IN REFUSING TO GIVE THE "THEORY OF DEFENSE" JURY INSTRUCTION REQUESTED.

Dambrell and Gabourie assert that the trial court should have given the "theory of defense" jury instruction requested by Gabourie. We hold that it was not an

abuse of discretion for the trial court not to give the requested instruction.

In *State v. Johns,* 112 Idaho 873, 880–81, 736 P.2d 1327, 1334–35 (1987), the Court stated:

> A defendant in a criminal action is entitled to have [the defendant's] legal theory of the case submitted to the jury under proper instructions. However, refusal of defendant's requested instructions allegedly dealing with [the defendant's] defense theory is not error where the proposed statement is either erroneous in its statement of the law, is not supported by the evidence or constitutes an impermissible comment on the evidence, or is adequately covered by other instructions given by the court.

(Citations omitted).

The requested instruction concerning the defense's theory of the case was directed to lack of motive, justification, and "[a]ny other evidence tending to prove reasonable doubt." The trial court noted that the requested instruction had been covered by other instructions. The trial court instructed the jury as to justifiable homicide, justifiable use of deadly force, as well as reasonable doubt. These instructions adequately covered all of the subjects included in the requested instruction, except lack of motive.

In *State v. Radabaugh,* 93 Idaho 727, 732–33, 471 P.2d 582, 587–88 (1970), the Court said:

> Motive is *not* an essential element of any crime unless it is made so by statute.... The authorities are in accord that although motive is relevant to the ultimate issue of defendant's guilt or innocence, presence or absence of motive becomes important only when the evidence fails to make out a satisfactory case.... Where evidence of motive was admitted it has been held not material error that the jury was not instructed as to motive where intent which moved the defendant was shown. Thus the issue of motive and specific instructions relating thereto become significant only where there is a

dearth of evidence tending to establish guilt.

(Emphasis in original) (citations omitted).

Although motive is not an essential element of any of the degrees of homicide with which Dambrell and Gabourie were charged, evidence of motive was presented by the prosecution. The prosecution's evidence suggested that Dambrell and Gabourie were indebted for a drug transaction and that they ambushed Seagoe to avoid paying the debt. The evidence also indicated the intent that moved Dambrell and Gabourie. There was not a dearth of evidence tending to establish guilt. Therefore, there was no requirement that the jury be instructed that they could consider the lack of motive.

## VI.

## THE JURY DID NOT ENGAGE IN MISCONDUCT.

 Dambrell and Gabourie assert that the jury engaged in misconduct by deliberating late into the night and by giving undue consideration to the fact that Dambrell and Gabourie did not testify. We disagree.

 The jury was not forced to deliberate late into the night—or early morning, as it actually was. The jury did not request to recess their deliberations until the trial court offered them the opportunity. In any event, the defendants did not object to their extended deliberations. The defendants waived the alleged error, if there was any. *Cf. State v. Silcox,* 103 Idaho 483, 650 P.2d 625 (1982) (judge's instruction to keep trying after the jury had already deliberated for seven hours was not coercive where counsel failed to object).

The jury was adequately instructed that the defendants had the right not to testify, that the jury must not draw any inference of guilt from the fact that a defendant did not testify, and should not discuss this fact nor allow it to enter into its deliberations. There is no evidence that the jury did anything to violate this instruction.

## VII.

### THE DEFENDANTS DID NOT PRESERVE AN ISSUE CONCERNING EVIDENCE OF THE VICTIM'S BAD CHARACTER.

Dambrell and Gabourie assert that the trial court should have allowed them to present evidence of Seagoe's bad character, especially his propensity for violence. We disagree.

Although Dambrell and Gabourie moved to strike testimony of Seagoe's wife that they characterized as evidence of Seagoe's good character, after discussion with the trial court outside the presence of the jury, defense counsel withdrew the motion. The defendants did not offer any evidence of Seagoe's bad character or his propensity for violence.[1] Therefore, they did not preserve any issue there might have been as to the admissibility of this type of evidence.

## VIII.

### THERE WAS A RATIONAL BASIS FOR ANY PERCEIVED INCONSISTENCY BETWEEN DAMBRELL'S CONVICTION FOR INVOLUNTARY MANSLAUGHTER AND GABOURIE'S CONVICTION FOR SECOND-DEGREE MURDER.

Dambrell and Gabourie assert that Dambrell's conviction for involuntary manslaughter was inconsistent with Gabourie's conviction for second-degree murder. We disagree.

The defendants argue that the theory of the prosecution was that Dambrell and Gabourie acted in concert and that each was responsible for the actions of the other.

They contend that the jury's acquittal of Dambrell on all charges of intentionally killing Seagoe constitute a specific finding that Dambrell did not participate in the murder committed by Gabourie. They point to the undisputed evidence that the shotgun blast fired by Dambrell did not kill Seagoe. They argue that Gabourie's murder of Seagoe constituted an independent, intervening, unforeseeable, and superseding event for which Dambrell cannot be held accountable. We disagree.

The courts of other jurisdictions have wrestled with the effect of the inconsistency of verdicts when multiple defendants are tried together for the same crime. Annotation, *Inconsistency of Criminal Verdicts as Between Two or More Defendants Tried Together*, 22 A.L.R.3d 717 (1968 & Supp.1990). Among the cases cited in this annotation are *People v. Caldwell*, 36 Cal.3d 210, 203 Cal.Rptr. 433, 681 P.2d 274 (1984), and *State v. Sully*, 219 Kan. 222, 547 P.2d 344 (1976).

In *Caldwell*, the California Supreme Court considered the case of two defendants who were tried jointly and were convicted of robbery and the murder of a co-felon killed by police in the course of a shootout. One defendant (Washington) was convicted of first-degree murder. The other (Caldwell) was convicted of second-degree murder. In discussing these verdicts, the court said:

> These verdicts are not necessarily inconsistent. While substantial evidence would have supported a first degree murder verdict for Caldwell, too, the different verdicts may be merely an expression of mercy by the jury, which may have

---

1. The dissent refers to a question that was posed to Seagoe's wife. The trial court sustained the prosecutor's objection to the question. The question was asked by Dambrell's attorney during the cross-examination of Mrs. Seagoe, whose testimony was presented as part of the state's case-in-chief. Gabourie's attorney did not ask a similar question. Therefore, to the extent that the question might have preserved the issue for appeal, only Dambrell preserved the issue.

The first ground for the objection was that it was outside the scope of the direct examination. A trial court has broad discretion in the admission of evidence at trial, and its judgment will only be reversed when there has been a clear abuse of discretion. *State v. Smith*, 117 Idaho 225, 232, 786 P.2d 1127, 1134 (1990); *State v. Tierney*, 109 Idaho 474, 477, 708 P.2d 879, 882 (1985); *State v. Terry*, 98 Idaho 285, 286–87, 561 P.2d 1318, 1319–20 (1977). On direct examination, the state did not ask Mrs. Seagoe about Seagoe's propensity for violence. The trial court did not abuse its discretion in sustaining the objection to the question. Neither Dambrell nor Gabourie subsequently attempted to offer evidence of Seagoe's propensity for violence.

considered Caldwell to be the less culpable of the participants in the entire course of conduct.

203 Cal.Rptr. at 440 n. 5, 681 P.2d at 281 n. 5.

In *Sully*, the Kansas Supreme Court considered the case of two defendants who were charged with first-degree murder and were tried jointly. One defendant (Hensley) was convicted of first-degree murder. The other defendant (Sully) was convicted of second-degree murder. Hensley was the one who fired the fatal shots. Sully only drove Hensley to and from the scene of the murder. In disposing of Sully's claim that his conviction should be overturned because it was inconsistent with Hensley's, the court said:

> The argument is that if the jury believed the prosecution's theory he should have been convicted of first degree murder; otherwise he should have been acquitted altogether. We think not. Jurors in a criminal case are not required to specify reasons for a particular verdict reached by them. The state points out there was some conflict in the evidence. Conceivably this may have supplied some reason for differentiation in verdicts, but aside from this "it has been firmly established by this court, as well as most other jurisdictions, the consistency of the verdict [in a joint trial] is not necessary." The modern rule appears to be that verdicts as between two or more defendants tried together need not demonstrate rational consistency.

547 P.2d at 350 (citation omitted).

In *State v. Jackett*, 45 Idaho 720, 264 P. 875 (1928), this Court considered a case in which two defendants were charged and tried jointly for the larceny of a cow. One defendant (Jackett) was convicted. The other defendant (Brosig) was acquitted. Jackett asserted the inconsistency of the verdicts in his appeal. In rejecting this argument, the Court stated a rational basis by which the jury might have resolved conflicting testimony in convicting Jackett and acquitting Brosig. *Id.* at 722–23, 264 P. at 876. This decision appears to put Idaho in line with those jurisdictions that have held

"that verdicts as between two or more criminal defendants tried together will not be held reversibly inconsistent if, upon a consideration of the facts and circumstances of the case, they can be explained or reconciled on any rational basis." Annotation, 22 A.L.R.3d 717, 727, § 6.

In denying Dambrell's motion for acquittal following the trial, the trial court reconciled the allegedly inconsistent verdicts in this case:

> [T]he jury could have reasonably concluded from the evidence that Dambrell and Gabourie agreed to commit a lawful act (the resistance of the entry by James Seagoe into the home), in an unlawful manner (with deadly force where deadly force was not called for), or without due caution and circumspection (by firing their weapons the instant the victim appeared in the doorway) and that such act caused the unlawful killing of James Seagoe. The jury might very well have further found that Gabourie went beyond the agreement when he shot the victim in the back of the head, thereby raising his culpability to Second Degree Murder.

We find this to be a rational basis for the different verdicts rendered by the jury.

## IX.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT THE NEWLY DISCOVERED EVIDENCE WOULD PROBABLY NOT HAVE PRODUCED AN ACQUITTAL IN A NEW TRIAL.

■ Dambrell and Gabourie assert that the trial court should have granted a new trial based on newly discovered evidence. We conclude that the trial court did not abuse its discretion in denying a new trial on the ground that the newly discovered evidence would probably not have produced an acquittal in a new trial.

After the trial, a .38 caliber handgun was dropped off by an unknown person at the office of Gabourie's former lawyer. Gabourie alleged in support of a motion for new trial that this was the weapon he had

at the time Seagoe was killed. At the hearing on the motion for a new trial, two experts testified that spent cartridge cases recovered from an area where Gabourie had conducted target practice and upon which the prosecution relied at trial, were not fired from the handgun discovered after trial. These experts also testified that the bullet fragments taken from Seagoe's head could not conclusively be linked to Gabourie's weapon. Both experts testified, however, that they could not exclude the newly discovered gun as the weapon that fired the fatal shot.

In denying the motion for a new trial, the trial court considered the test adopted by this Court in *State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976). The trial court focused particularly on the requirement that for a new trial to be warranted, it would have to conclude that the newly discovered evidence would probably produce an acquittal in a new trial.

The trial court said that the presence of Gabourie's gun at a new trial would have prevented the use of the spent cartridges to tie the murder weapon to Gabourie, but would have established that Gabourie owned a gun that was capable of firing the fatal bullet. As to the expert testimony presented in support of the motion for new trial, the trial court said it was inconclusive whether Gabourie's gun fired the fatal bullet. The trial court concluded that in a new trial, the newly discovered evidence would probably not have changed the result of the first trial.

Whether to grant or deny a new trial is a discretionary matter for the trial court, and we will review the trial court's decision only to determine if it has abused its discretion. *State v. Lankford*, 116 Idaho 860, 873, 781 P.2d 197, 210 (1989). In this case, the trial court evidenced that it understood it had discretion whether to grant a new trial, its decision was within the scope of its discretion and consistent with the *Drapeau* test, and the trial court gave a reasoned basis for its decision. *See* 115 Idaho at 600, 768 P.2d at 133. Therefore, the trial court did not abuse its discre-

tion in denying a new trial on the basis of the newly discovered evidence.

## X.

## CONCLUSION.

We affirm the convictions of Dambrell and Gabourie.

BAKES, C.J., and BOYLE, and McDEVITT, JJ., concur.

BISTLINE, Justice, concurring in part and dissenting in part.

### PART I—Concurring.

Other than on the character issue, *infra*, Part II, I readily agree with the opinion for the Court which Justice Johnson has authored.

### PART II—Dissenting.

In Part VII of the majority opinion, it is held that the defendants did not preserve the issue concerning evidence of the victim's bad character. The opinion states:

> Although Dambrell and Gabourie moved to strike testimony of Seagoe's wife that they characterized as evidence of Seagoe's good character, after discussion with the trial court outside the presence of the jury, defense counsel withdrew the motion. The defendants did not offer any evidence of Seagoe's bad character or his propensity for violence. Therefore, they did not preserve any issue there might have been as to the admissibility of this type of evidence.

Slip Op. at 541, 817 P.2d at 655.

However, at trial the defendants were rebuffed by a doubtful ruling of the trial court in their attempt to elicit testimony from the victim's wife regarding the victim's bad character:

> Q. Did you have a fear that he was going to try to hurt your mother?
>
> MR. WALKER: Objection, your Honor. That is outside the scope of the direct. It is clearly improper under the rules. It's improper under Rule 404. It's impeachment by bad acts. It's disallowable under the rules.
>
> MR. LEMPESIS: It's offered for—

MR. WALKER: It's exactly what we covered in the hearing a little while ago, Judge.

THE COURT: Sustained.

MR. WALKER: Thank you. I move to strike the question, your Honor.

THE COURT: Granted.

Tr. Vol. 11, 2397.

The trial court erred in precluding the defendants from presenting evidence of the victim's bad character. Evidence of bad or violent character of the deceased is allowed when the defendant pleads self-defense, as it was in the instant case. I.R.E. 404(a)(2). This was also the common law rule:

> Where self-defense is interposed and it appears that there was a more or less mutual combat between the parties, the reputation of the deceased for being turbulent, quarrelsome and dangerous, if communicated to the appellant prior to the affray, is admissible as bearing upon the question of who was the probable aggressor and whether or not the appellant had reasonable cause to believe that his life was in danger. (30 C.J. 229; *People v. Dugas*, 310 Ill. 291, 141 N.E. 769.)

*State v. Wilson*, 41 Idaho 616, 631, 243 Pac. 359, 362 (1925). The circumstances attendant to the looming confrontation are reminiscent of old time shootouts.

The trial court could not preclude the defendants from questioning Seagoe's wife as to Seagoe's propensity for violence on the basis that such questions went beyond the scope of the direct examination. On direct examination Seagoe's wife had testified at length as to Seagoe's character, declaring that "Jimmy was a good person"

and he wanted to get off drugs; that in high school he was a star athlete, a brilliant academic and class president for four years; and that he mended fences, built closets and took care of animals, among them his horse Shadow. Clearly, it was the prosecutor who had opened up the issue of the deceased's character. Having admitted the testimony offered to prove good character, the trial court incorrectly precluded questioning as to Seagoe's bad character. That evidence was properly offered and the ruling precluding it was error. Had the prosecutor not opened up that issue, even then there is no case law precedent which would have precluded the defense from offering testimony that the deceased was possessed of bad traits. Where the prosecution opened the issue with its witness on the stand, the defense was without question entitled to cross-examine the witness as to the character of the deceased so as to support its claim that there was good reason for the defendants to be fearful and apprehensive in a confrontation which was about to take place.

The trial court's ruling disallowing bad character evidence denied the defendants their right to a fair trial. If there is to be justice in the prosecution of criminal actions, these convictions must be vacated and the cause remanded for a new trial, or better in my mind, two separate trials.