898 P.2d 615

**STATE of Idaho, Plaintiff–Respondent Cross–Appellant,**

v.

**Daniel E. GARDINER, Defendant– Appellant Cross–Respondent.**

No. 20889.

Court of Appeals of Idaho.

June 9, 1995.

Petition for Review Denied Aug. 3, 1995.

Knowlton, Miles, Merica & Brudie, P.A., Lewiston, for appellant. Charles A. Kovis argued.

Alan G. Lance, Atty. Gen., Douglas A. Werth, Deputy Atty. Gen., Boise, for respondent. Douglas A. Werth argued.

Moffatt, Thomas, Barrett, Rock & Fields, Boise, for amicus curiae, Blue Cross of Idaho Health Services, Inc. and Medical Services Bureau of Idaho, Inc.

WALTERS, Chief Judge.

Daniel Gardiner appeals from a judgment of conviction for felony injury to a child, I.C. § 18–1501(1), and from his sentence of not less than eight nor more than ten years. The state cross-appeals from an order denying restitution to the victim's insurer, Blue Cross. We uphold Gardiner's conviction and sentence and affirm the district court's order denying restitution to Blue Cross.

### FACTS AND PROCEDURAL BACKGROUND

The transcript of the jury trial provides the following background in this case. On November 6, 1992, eleven-month-old T.E. awoke at the home of his father, Tony Edmison. Edmison resided with his girlfriend, Marcaie Gord, and Gord's two children, who were approximately one and two years old, respectively. Edmison had picked up T.E. the previous day from the home of T.E.'s mother, Christine Gardiner, and her husband of one-and-a-half weeks, appellant Daniel Gardiner. Edmison testified that on the morning of November 6, after providing breakfast for the three children and bathing them, he and Gord took the children to the home of Edmison's parents. Edmison, his parents, his grandparents, and his uncle, all of whom were present at some point during the day, testified that T.E. acted the same as usual throughout the day, crawling on the floor, walking while holding onto furniture,

and playing with the other children and the extended family. At approximately 1:45 p.m., Edmison left his parents' home with his uncle. Gord and the three children left at approximately 2:00 p.m.

Gord testified that she returned home with the children shortly after 2:00 p.m. and put the children down for a nap. At approximately 2:30 p.m., she telephoned Christine at work, informing her that she could pick up T.E. Christine and Gardiner arrived at approximately 2:40 p.m., and Christine came inside to get T.E. while Gardiner waited in the car. Gord informed Christine that T.E. had not yet taken a nap and was becoming "fussy" about one of his ears. Gord further testified she told Christine that shortly before Christine's arrival, T.E. had taken his first unassisted steps.

Christine testified that when she entered Gord's home, T.E. was on the floor with his bottle and that when he saw Christine, he threw his bottle and crawled toward her. Christine further testified that T.E. cried on the way home, and that upon returning home, she put him in his bedroom crib for a nap. T.E. continued to cry while Gardiner was in T.E.'s room searching for something in the closet. Between 3:00 and 3:30 p.m., Christine left the house to pick up Gardiner's daughter, Vanessa, who resided with them. When Christine returned shortly after 4:00 p.m., Gardiner came running out of the apartment and told her to get inside the house because T.E. had thrown up and he could not get T.E. to stop. When Christine entered the house, she noticed the odor of vomit and saw T.E. lying on the living room floor. She went to T.E., who was "very unresponsive," and picked him up. She tried to get T.E. to open his eyes but he would not. He did not appear to be breathing. Christine then told Gardiner that they should call 911, but Gardiner suggested that they drive him to the hospital. Christine administered CPR on T.E. to no avail. Gardiner then called an ambulance.

Dr. Brian Hocum works in the emergency unit of St. Joseph Regional Medical Center in Lewiston, Idaho, and testified that T.E. arrived with "severe respiratory distress." He further testified that Gardiner informed him that the child was having seizures and that he shook T.E. in order to try to revive him. Dr. John Harris, who has been T.E.'s physician since T.E.'s birth, testified that he saw T.E. the day prior to the injury and that T.E. appeared fairly active, alert and happy. Dr. Harris stated that there was nothing about T.E. that caused him any concern other than the fact that there was some fluid behind T.E.'s ears for which he prescribed amoxicillin. Dr. Harris further testified that he next saw T.E. when he was called to the emergency room of St. Joseph's on November 6, 1992. He stated that a CAT scan revealed that T.E. had a comminuted fracture on the left side of his skull, which was usually caused by a tremendous degree of force applied to the skull, and that T.E. also had subdural hematoma and retinal hemorrhages. Dr. Harris stated that these injuries were common in abused children and opined that they were caused by T.E. being shaken and impacting a hard object. Harris testified that, based on the severity of T.E.'s injuries, he arranged for T.E. to be flown to Sacred Heart Medical Center in Spokane, Washington, for a neurosurgical evaluation. Dr. Peter Graves of Sacred Heart also testified that T.E. had a comminuted skull fracture, retinal hemorrhage, cerebral edema and subdural hematoma, which were caused by a severe blow to the head.

Dr. Harris further testified that based on his observations of T.E. at the time of and after the injury, he believed that most likely, T.E. will always have marked degrees of brain damage and will not be able to obtain the developmental level of a one year-old child. He also stated that there is a good likelihood that T.E. will go blind in one or both eyes.

A jury trial was held, and at the close of the state's case, Gardiner moved for acquittal, which the district court denied. Gardiner was found guilty of felony injury to a child, I.C. § 18–1501(1). During the sentencing hearing, the state argued that Gardiner should be ordered to pay restitution to Blue Cross in the sum of $88,120.50 for medical services Blue Cross provided to T.E. as a result of the injury. *See* I.C. § 19–5304(2). The district court held a restitution hearing,

and in a written order denied the state's request for restitution to Blue Cross.

Gardiner was sentenced to a period of confinement of not less than eight nor more than ten years. He subsequently filed a motion for reduction of sentence pursuant to I.C.R. 35, which the district court denied. Gardiner appeals from the judgment of conviction and sentence and the state cross-appeals from the district court's order denying restitution to Blue Cross. We affirm in all respects.

## ANALYSIS

### I. COMMUNICATIONS BETWEEN GARDINER AND THE HOSPITAL CHAPLAIN

■ At trial and over Gardiner's objection, the state called as a witness the full-time chaplain at St. Joseph's, James Aronen. Aronen described his duties at the hospital as helping families in difficult situations with "spiritual problems" and acting as a "liaison between medical staff and the families or in some cases the patients." Aronen testified that he met Daniel and Christine Gardiner when they arrived at the hospital on November 6, 1992. The Gardiners went with Aronen into a room adjacent to the emergency room to discuss what had taken place.

Aronen further testified that Gardiner informed him that on the day of the injury, he left T.E. alone in the residence and went to check on the laundry. When he returned, Gardiner saw that T.E. was on the floor and had vomited and appeared limp. Gardiner told Aronen that he then "picked up the child and shook him" and that "maybe [he] shook him too hard." Gardiner also told Aronen that when Christine had returned to their home, he informed her that she "better get [her] butt in there" because something was wrong with the child. Gardiner argues that his statements to Aronen were privileged communications which the district court should have excluded.

Idaho Rule of Evidence 505(b) provides that: "A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman in the clergyman's professional character as spiritual advisor." A communication made to a clergyman is confidential "if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication." I.R.E. 505(a)(2); see also State v. Hedger, 115 Idaho 598, 601, 768 P.2d 1331, 1334 (1989).

In the instant case, the district judge found that the communications were not made in private and that the privilege therefore did not apply. The facts of this case support the district court's finding. First, Aronen acted as a conduit between the hospital and patients or their families. Therefore, his role was not simply one of a "spiritual advisor," I.R.E. 505(b), nor were Gardiner's communications "made privately and not intended for further disclosure," I.R.E. 505(a)(2).

Moreover, the circumstances surrounding the discussion between Aronen and the Gardiners compel the conclusion that the communication was not made in private. For example, Aronen testified at trial that the door to the room where the parties spoke was open and that hospital staff "were going back and forth" just outside the room. Additionally, during the state's offer of proof, Aronen testified that he could hear what was being said outside of the room; that no effort was made to prevent others from hearing his conversation with Gardiner; and that Aronen was not asked to close the door or to keep the matters confidential. Aronen also testified that he often told families that he shared information with the medical staff; however, he did not remember whether he so informed the Gardiners.

Christine testified that Aronen did not represent that the conversations would be kept confidential but did not remember whether Aronen stated that he would pass along the information to anyone. Christine also testified that she did not know whether their communication was supposed to be confidential.

Moreover, testimony by other witnesses suggests that Gardiner did not intend the communications to Aronen to remain confidential. Doctors Hocum, Harris and Graves

testified that Gardiner told them that he shook the child. Detective Alan Johnson also testified that Gardiner told him that he shook the child and that when Christine came home, Gardiner told her to "get her butt in here" to take care of T.E. Additionally, defense counsel elicited testimony regarding Gardiner's command to Christine. During the state's direct examination of Vanessa, Gardiner's daughter, Vanessa testified that when she and Christine returned home, Gardiner came running out of the house saying, "get in here and clean up this mess because the kid's puking all over." During cross-examination, defense counsel elicited the following:

BY [DEFENSE COUNSEL]:

Q. Vanessa, you said when you got back to the house after the dance that your dad was outside saying, get in here, the kid's puking all over. Is it possible at that time that he made the statement, get your butt in here, [T.E.'s] puking and I don't know what's wrong?

A. Yes.

The fact that Gardiner made similar statements to others and that defense counsel did not object to their admission during trial provides further evidence that Gardiner did not intend that the communication be kept confidential.

Based on the foregoing, we conclude that the communication was not received by Aronen in his "professional character as spiritual adviser," I.R.E. 505(b), nor was it "made privately" as required by I.R.E. 505(a)(2). The statements therefore did not constitute privileged communication protected by Rule 505, and were properly admitted.

## II. PRIOR BAD ACTS

During trial, the state called Loretta and William Gietler to testify regarding an earlier incident at the Strike and Spare restaurant. The couple testified that they observed Gardiner, Christine, T.E. and another man sitting at one of the booths in the restaurant. T.E. subsequently began playing with artificial flowers which were on the divider between the booths, whereupon Gardiner slapped his hands. When T.E. continued to play with the flowers, Gardiner squeezed T.E.'s head for a prolonged period of time, causing T.E. to cry. Gardiner assigns error to the district court's admission of this testimony.

We note that although Gardiner objected earlier to Christine's testimony regarding the same incident, he failed to object to the Gietlers' testimony. Issues not raised at the trial court level may not be raised for the first time on appeal. *State v. Mauro,* 121 Idaho 178, 180, 824 P.2d 109, 111 (1991). An exception to this rule applies if the issue raised on appeal addresses a fundamental right. *Id.* " 'Error that is fundamental must be such error as goes to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive.' " *State v. Bingham* 116 Idaho 415, 423, 776 P.2d 424, 432 (1989) (citations omitted). *See also State v. Higgins,* 122 Idaho 590, 596, 836 P.2d 536, 542 (1992). An alleged erroneous decision to admit evidence is a trial error and does not go to the foundation of the case or take from the defendant a right which was essential to his defense. *Bingham, supra; Higgins, supra.* Because Gardiner did not object to the Gietlers' testimony below, he is precluded from challenging the admissibility of their testimony on appeal.

Gardiner suggests, however, that his earlier objection to Christine's testimony regarding the incident served as a standing objection which encompassed the Gietlers' testimony. Under the circumstances of this case, we disagree. The sequence of events by which testimony about the incident at the Strike and Spare unfolded indicate that Gardiner opened the door to the Gietlers' testimony.

During Christine's testimony, the state inquired into the incident at the restaurant. Christine began to testify that, while the four of them were seated at the table, T.E. kept reaching for silk flowers which were on the table. Defense counsel objected at that point and a discussion took place outside the presence of the jury. During the discussion, defense counsel objected to the "line of testi-

**162**

mony that we are getting into," and argued that the state should not be allowed to use the "prior bad act" at the Strike and Spare to show that Gardiner acted in conformity with a particular character trait. *See* I.R.E. 404(b). The state argued that Gardiner's behavior at the restaurant demonstrated motive, intent, and habit or routine. The following colloquy then occurred:

> THE COURT: Counsel, I'm going to sustain your objection. [Prosecutor], those cases that you are dealing with in this particular rule usually require some identity, some conformity with the facts, some similarity between the facts so that a comparison could be made.

> At this stage, I don't see that it's present so I'm going to disallow this line of questioning.

> [PROSECUTOR]: Thank you, your Honor. And should there be more foundation, [the] State will probably bring this up again. Thank you.

> THE COURT: That will be your right.

The incident was not pursued again until defense counsel raised the issue during his cross-examination of Christine. The following dialogue took place:

> Q. You also testified that you're primarily responsible for the disciplining of [T.E.]?

> A. Yes.

> Q. And you said that at times [T.E.] had his hands slapped?

> A. Uh-huh.

> . . . . .

> Q. Have you been present on occasion when Mr. Gardiner has disciplined T.E.?

> A. Yes.

> Q. Has he ever done anything which in your opinion is inappropriate?

> A. No.

During redirect examination of Christine, the state attempted to undermine the testimony elicited by defense counsel during cross-examination:

> Q. Now, [Defense Counsel] asked you if you had ever seen Mr. Gardiner discipline T.E. inappropriately and your response was "no."

> A. No.

> Q. Do you think that it's appropriate discipline to grab the top of a child's head and squeeze until he cries?

> A. No.

> Q. And, in fact, didn't Mr. Gardiner do that on one occasion?

> [DEFENSE COUNSEL]: Your Honor, again at this point I would renew my previous objection to this.

> THE COURT: Overruled, Counsel.

> BY [PROSECUTOR]:

> A. I don't ever remember him doing that, no.

> Q. Do you recall the incident at the Strike and Spare Restaurant?

> A. Yes.

> Q. And do you recall what discipline was administered by Mr. Gardiner at the Strike and Spare?

> A. All I remember was him slapping his hand for going after the silk flowers, that's all I remember.

> Q. You don't remember him grabbing his head?

> A. No, no.

The Gietlers' subsequent testimony served to impeach Christine's statement that Gardiner never inappropriately disciplined T.E. Gardiner opened the door to the Gietlers' testimony by eliciting testimony from Christine regarding the couple's disciplinary procedures. Consequently, the Gietlers' testimony was properly admitted in order to rebut the assertions elicited by defense counsel via Christine.

### III. *MOTION FOR ACQUITTAL*

██ Gardiner contends that the district court erred in denying his motion for acquittal. The standards for deciding and reviewing a motion for judgment of acquittal under I.C.R. 29 are the same as those applied in reviewing the sufficiency of evidence to support a jury's guilty verdict. *State v. Boag,* 118 Idaho 944, 947, 801 P.2d 1295, 1298 (Ct. App.1990). Under these standards, an appellate court will not set aside a judgment of conviction entered upon a jury verdict if there is substantial evidence upon which a

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* On appeal, where a defendant stands convicted, the evidence is viewed in the light most favorable to the prosecution and the reviewing court is precluded from substituting its judgment for that of the jury as to the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn from the evidence. *Id.*

■ Gardiner argues that the state only proved during its case-in-chief that T.E. suffered a serious injury, not that Gardiner was the one who inflicted it. He stresses testimony by Christine and Vanessa regarding an incident on November 3, 1992, where T.E. had fallen down in the kitchen and bumped his head on a table.[1] Gardiner suggests that T.E.'s symptoms on November 6 could have resulted from that fall. We note, however, that substantial evidence indicated otherwise.

■ Christine testified that although T.E. cried directly after falling down, he subsequently appeared "normal." Vanessa testified that after the fall, T.E. got back up and resumed playing. In addition, Dr. Harris, who saw T.E. on November 5, testified that T.E. had a bruise on his cheek as a result of the fall but had no other symptoms that caused him concern other than those caused by the onset of an ear infection. All of the doctors who examined T.E. on November 6 testified that the injury resulted from a blow of extreme impact. Dr. Harris testified that comminuted skull fractures, such as that sustained by T.E., are "fairly rare" and do not occur from falling on a piece of furniture. He further opined that T.E. was the victim of battered child syndrome. In addition, Gord, Edmison and several members of Edmison's family testified that T.E. was active and happy on November 5th and 6th. A jury could reasonably conclude, therefore, that T.E.'s injuries were not caused by his fall in the kitchen.

■ Gardiner also argues that the medical testimony of Dr. Harris and Dr. Graves demonstrated that T.E.'s injuries could have occurred immediately after or as long as eight hours prior to his vomiting and seizures. He asserts that because T.E. was in the custody of Edmison and Gord within eight hours of the injury, a jury could not have found beyond a reasonable doubt that Gardiner was the one who inflicted the injuries on T.E.

There is substantial evidence, however, indicating that the injury occurred during the time that T.E. was in Gardiner's sole custody. For example, Gord testified that although T.E. had a minor ear infection, he was fine when Christine picked him up. Christine testified that when she went to pick up T.E., he crawled toward her. Dr. Harris and Dr. Graves testified that it was unlikely T.E. would have been able to crawl after the blow was inflicted, and Dr. Graves testified that he would not have expected T.E. to appear normal after the injury.

Additionally, Dr. Harris testified that in his opinion, T.E.'s symptoms occurred in very close proximity to the severe blow, probably within minutes. He also stated his belief that the symptoms progressed over a very brief period of time and that T.E.'s vomiting and seizures were caused by the trauma. A jury could reasonably conclude beyond a reasonable doubt that Gardiner, and not Gord or Edmison, was the source of T.E.'s injury.

Moreover, other testimony suggested that Gardiner was quite frustrated with T.E. Before the injury, Gardiner told one co-worker, Jimi Jo Maxwell, that he and Christine had been up all night arguing about T.E. Gardiner told Maxwell that T.E. was spoiled and that he cried all the time, and always wanted his mother to hold him, and that he was going to " 'cure [T.E.] of the crying, of the spoiled brat in him.' " Two weeks before the injury, Gardiner told another co-worker that if Christine did not take care of the problem with T.E., he would one way or another. Also, Vanessa testified that when T.E. cried, Gardiner would sometimes hold him up in the air and shake him to try to get him to stop

---

1. The date of the fall is unclear. Christine testified that it occurred on November 3, whereas Dr. Harris testified that Christine informed the nurse that the fall occurred November 4.

crying and that he would often yell at Christine, "[S]hut that baby up or I'm going to."

The jury also heard evidence indicating that Gardiner was reluctant to call an ambulance for T.E. Vanessa testified that when asked by Christine to call an ambulance, Gardiner stated, "no, that he's okay" and that he only agreed to call the ambulance after Christine stated that she would do so if he refused. The jury also heard evidence indicating that Gardiner attempted to prevent Vanessa from testifying. When Vanessa was asked by the prosecutor whether Gardiner spoke with her after she testified at the preliminary hearing, Vanessa stated as follows:

A. Yeah, he told me that what I had said that was all lies and he just didn't see where I could get that from. And then when you guys was going to come subpoena me into court, he was going to hide me out at his friend's named Bill because he didn't want m[e] to go to court.

Based on the foregoing, we conclude that a rational trier of fact could find beyond a reasonable doubt that Gardiner committed the crime of felony injury to a child. Consequently, the district court properly denied Gardiner's motion for judgment of acquittal.

## IV. *RULE 35 MOTION*

■■■■ Gardiner also argues that the district court erred in denying his motion for a reduction of sentence pursuant to I.C.R. 35. A motion to reduce a lawful sentence is essentially a plea for leniency, addressed to the sound discretion of the sentencing court, which may be granted if the original sentence was unduly severe. *State v. Lopez*, 106 Idaho 447, 450, 680 P.2d 869, 872 (Ct.App. 1984). On appeal, the lower court's decision to grant or to deny a request for reduction of sentence will not be disturbed in the absence of an abuse of discretion. *State v. Sutton*, 106 Idaho 403, 404, 679 P.2d 680, 681 (Ct. App.1984). Where a sentence is alleged to be excessive, the appellate court will make an independent examination of the record, having regard to the nature of the offense, the character of the offender, and the protection of the public interest. *State v. Shideler*, 103 Idaho 593, 594, 651 P.2d 527, 528 (1982). A

sentence of confinement is reasonable if it appears at the time of sentencing that confinement is necessary to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation, or retribution applicable to a given case. *State v. Walker*, 125 Idaho 11, 12, 867 P.2d 244, 245 (Ct.App.1993); *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982).

■■■ Based on the facts of this case, we hold that Gardiner's sentence of not less than eight nor more than ten years serves to accomplish the goals of sentencing and was not excessive. Accordingly, we uphold the district court's order denying Gardiner's Rule 35 motion.

## V. *THE STATE'S CROSS-APPEAL*

The state and Amicus Curiae, Blue Cross, argue that the district court erred in ruling as a matter of law that Blue Cross was not entitled to restitution for amounts it paid for T.E.'s health care as a result of Gardiner's offense.

I.C. § 19-5304, the statute governing restitution for crime victims, states as follows:

(2) Unless the court determines that an order of restitution would be inappropriate or undesirable, it shall order a defendant found guilty of any crime which results in an economic loss to the victim to make restitution to the victim.... Restitution shall be ordered for any economic loss which the victim actually suffers. The existence of a policy of insurance covering the victim's loss shall not absolve the defendant of the obligation to pay restitution.

I.C. § 19-5304(1) defines "victim" as follows:

(e) "Victim" shall mean a person or entity, named in the complaint, information or indictment, who suffers economic loss or injury as the result of the defendant's criminal conduct and shall also include the immediate family of a minor and the immediate family of the actual victim in homicide cases. Victim shall also mean any health care provider who has provided medical treatment to a victim if such treatment is for an injury resulting from the defendant's criminal conduct, and who has

not been otherwise compensated for such treatment by the injured victim.

"To qualify for restitution, a claimant must be a victim as that term is used in the statute." *State v. Aubert,* 119 Idaho 868, 870 n. 4, 811 P.2d 44, 46 n. 4 (Ct.App.1991).

Blue Cross first argues that it falls within the statute's definition of "victim" because it is a "health care provider who has provided medical treatment to a victim," I.C. § 19–5304(1)(e), rather than an "insurer," as found by the district court. In support of its argument, Blue Cross states that it is a "health care service corporation" organized pursuant to I.C. § 41–3401, *et seq.,* and that a health care service provider organized under these provisions is not an insurer.

 Blue Cross's assertion that it is not an insurer is supported by this Court's holding in *Howard v. Blue Cross of Idaho Health Service, Inc.,* 114 Idaho 485, 757 P.2d 1204 (Ct.App.1987). In *Howard,* we held that an award of attorney fees against Blue Cross based on I.C. § 41–1839 (the statute allowing attorney fees in suits against insurers) [2] could not be sustained. In so holding, this Court stated, "Blue Cross is not an 'insurer' as defined by I.C. §§ 41–103 and 41–3301(2). Rather, Blue Cross is a nonprofit 'service corporation' as defined by I.C. § 41–3403(2)." *Id.* at 490, 757 P.2d at 1209. The question presented in this case, then, is whether a "service corporation," as defined by I.C. § 41–3403(2), is a "health care provider," as contemplated by I.C. § 19–5304(1)(e). We hold that it is not.

I.C. § 41–3403(2) defines a "service corporation" as "a corporation providing all or part of one or more health care services for subscribers thereto in exchange for periodic prepayments in identifiable amount by or as to such subscribers." While Blue Cross provides "health care services," I.C. § 41–3403(2), we hold that it is not a "health care provider who has provided medical *treatment* to a victim." I.C. § 19–5304(1)(e) (emphasis added). Providing the funds through which

a victim is able to receive medical treatment from hospital staff, as Blue Cross has done here, is not the equivalent of providing medical treatment, as contemplated by I.C. § 19–5304(1)(e). Blue Cross merely *facilitates* the health care provider in providing medical treatment; it does not provide the treatment itself. We are therefore unpersuaded by Blue Cross's argument that it is "a health care provider who has provided medical treatment to a victim," I.C. § 19–5304(1)(e), and is therefore a "victim" as defined by the statute.

 The state also argues that the legislative intent of the restitution statute is to "require defendants to pay for the harm that they cause" and that the statute should therefore be liberally rather than narrowly construed. We note, however, the specificity with which the legislature has defined "victim." According to the statute, one entitled to restitution must either be 1) a person or entity named in the complaint, information or indictment who suffers economic loss or injury as a result of the defendant's actions; [3] 2) the immediate family of a minor; 3) the immediate family of the actual victim in homicide cases; or 4) a health care provider who has provided medical treatment to a victim.

 The maxim, *expressio unius est exclusio alterius,* is applicable here. The legislature provided an express list of those people and entities entitled to restitution and clearly did not include insurers or "service providers" such as Blue Cross. The legislature was not unmindful of the issue of insurance, as it addressed the issue in subsection (2), which reads, "The existence of a policy of insurance covering the victim's loss shall not absolve the defendant of the obligation to pay restitution." Based on the foregoing, we are compelled to conclude that the legislature did not intend to include insurers and similar entities in its definition of victim.

---

2. We note that the 1988 Legislature responded to *Howard* by making I.C. § 41–1839 applicable to corporations like Blue Cross. *See* I.C. § 41–3434(17); *Eriksen v. Blue Cross of Idaho,* 116 Idaho 693, 694, 778 P.2d 815, 816 (Ct.App.1989).

3. Blue Cross was not named in the complaint or information filed in this case.

■■■■■ Relying on *International Equipment Service, Inc. v. Pocatello Industrial Park Co.,* 107 Idaho 1116, 695 P.2d 1255 (1985), Blue Cross further posits that even if it is not included in the statute's definition of victim, it is nonetheless entitled to restitution pursuant to I.C. § 19–5304 under a theory of subrogation. Blue Cross's contention is untenable. As this Court stated in *Aubert,* "it is generally recognized that courts of criminal jurisdiction have no power or authority to direct reparations or restitution to a crime victim in the absence of a statutory provision to such effect." 119 Idaho at 869, 811 P.2d at 45 (citations omitted). Consequently, the authority to award restitution in this case must reside within the confines of the restitution statute. As previously explained, I.C. § 19–5304 does not permit an award of restitution to Blue Cross, as it is not a victim under the statute. Based on the foregoing, we hold that Blue Cross may not recover from Gardiner in this action the amounts it paid on behalf of T.E. *See also People v. Williams,* 207 Cal.App.3d 1520, 255 Cal.Rptr. 778, 780 (1989).

The dissent cites various cases for the proposition that insurance companies, as subrogees, have the same right to claim restitution in criminal proceedings as the victims whom the insurers have paid. We note, however, that many of the decisions cited are not predicated on a subrogation theory, but rest instead on the premise that insurers are "victims" under applicable restitution statutes.

Moreover, in these cases, the definitions of "victim" in the applicable restitution statutes are not as comprehensive as the definition found in I.C. § 19–5304(1)(e), or the statutes are significantly broader than Idaho's counterpart. *See Hagler v. State,* 625 So.2d 1190, 1191 (Ala.Crim.App.1993) ("victim" defined as "[a]ny person whom the court determines has suffered a direct or indirect pecuniary damage as a result of the defendant's criminal activities"); *Rogers v. State,* 210 Ga.App. 164, 435 S.E.2d 457 (1993) ("victim" defined as "any natural person or his personal representative or any firm, partnership, association, public or private corporation, or governmental entity suffering damages caused by an offender's unlawful act" O.C.G.A. § 17–14–2(9) [4]); *State v. Brooks,* 116 N.M. 309, 862 P.2d 57, 63 (App.1993) ("victim" defined as "any person who has suffered actual damages as a result of the defendant's criminal activities"; "actual damages" defined as "all damages which a victim could recover against the defendant in a civil action arising out of the same facts"); [5] *People v. Chery,* 126 A.D.2d 659, 511 N.Y.S.2d 88 (1987) (no definition of victim included in restitution statute as it then existed; *see* Penal Law § 60.27(1) and § 65.10(2)(g)); *State v. Stayer,* 706 P.2d 611, 613 (Utah 1985) ("victim" defined as "a person who the court has determined has suffered pecuniary damages as a result of the defendant's criminal activities"; "person" defined as "an individual, public or private corporation, a government, a partnership, or an unincorporated association"); *Alger v. Commonwealth,* 19 Va.App. 252, 450 S.E.2d 765, 767 (1994) (restitution statutes to be read in *pari materia* with victim impact statute which defines "victim" as "an individual ... who has suffered ... economic harm" from the crimes.).

Another case cited by the dissent, *State v. Steffy,* 173 Ariz. 90, 839 P.2d 1135 (App.1992), is similarly inapplicable because of the differences in that jurisdiction's restitution statutes. First, the statutes do not define "victim." A.R.S. § 13–603(C) provides that where a person is convicted, "the court shall require the convicted person to make restitution to the person who is the victim of the crime or to the immediate family of the victim if the victim has died, in the full amount of the economic loss as determined by the court ..." In addition, A.R.S. § 13–804(B) provides that in ordering restitution, "the court shall consider *all* losses caused by the criminal offense or offenses for which the defendant has been convicted" (emphasis added).

---

4. Where the definitions do not appear in the cases cited, the statute citations have been provided.

5. It is unclear in *Brooks* whether the court relied primarily on a subrogation theory or on the premise that insurers are victims under the restitution statute.

The restitution statutes in the above cases are not comparable to Idaho's restitution statute. We therefore do not find these decisions persuasive authority for the assertion that an insurer of a party directly injured by a defendant's criminal activities is entitled to restitution under I.C. § 19–5304(1)(e).

Nor are we persuaded by those cases cited by the dissent which rely on a subrogation theory, as the courts provide little authority or analysis to support their conclusions. *See Warzybok v. State,* 505 So.2d 507 (Fla.Dist. Ct.App.1987), and case on which it relies, *Amison v. State,* 504 So.2d 473 (Fla.Dist.Ct. App.1987); *LaFleur v. State,* 848 S.W.2d 266 (Tex.Ct.App.1993).[6]

The dissent also asserts that our decision "gives the criminal a windfall if the victim has had the foresight to obtain insurance and if the insurer promptly lives up to its responsibilities." We disagree. As previously explained, pursuant to I.C. § 19–5304(2), the existence of an insurance policy covering the victim's loss does not absolve a defendant of the obligation to pay restitution. However, the statute requires the defendant to make restitution to the victim, not to the victim's insurer. As stated by a California Court of Appeal in another case the dissent cites, *People v. Sexton:*

> Our conclusion that the insurer in this case cannot be the beneficiary of a restitution order does not mean that appellant gains a windfall. We agree with the Attorney General that it makes no sense to

excuse a defendant from paying restitution simply because of the fortuity that the victim has insurance coverage. A trial Court, in its discretion, may still order the restitution paid to the victim and leave it to the insurer and the victim-insured to work out repayment under the terms of their insurance contract. In the event the insurer pursues its subrogation rights and obtains a judgment against [the defendant] for the indemnified loss he would be entitled to a credit for any payments made to the insured-victim against the judgment for the "same" loss.

33 Cal.App.4th 64, 39 Cal.Rptr.2d 242 (1995). Blue Cross may pursue a separate civil action against Gardiner on a subrogation theory; however, this right does not exist under the restitution statute applicable to this criminal action.[7]

Finally, the dissent indicates that the number of courts declining to extend restitution to insurers of direct victims is insignificant. This is inaccurate. *See People v. Sexton, supra; People v. King,* 648 P.2d 173 (Colo. Ct.App.1982);[8] *People v. Daugherty,* 104 Ill. App.3d 89, 59 Ill.Dec. 807, 432 N.E.2d 391 (1982); *Montgomery v. State,* 292 Md. 155, 438 A.2d 490 (1981)[9]; *State v. Getsinger,* 27 Or.App. 339, 556 P.2d 147 (1976) (car insurer, which paid owner's claims arising out of unauthorized use of car, was not "aggrieved party" within meaning of statute providing for restitution to "aggrieved party" upon grant of probation)[10]; *Commonwealth v.*

---

**6.** The remaining case cited by the dissent, *State v. Jola,* 409 N.W.2d 17 (Minn.Ct.App.1987), is inapposite.

**7.** An Illinois appellate court similarly has said: [A]n insurance company is not "the victim" within the meaning used in [Ill.Rev.Stat.1979, ch. 38, ¶ 1005–5–6]. To include insurance companies within the protections of section 5–5–6 would significantly broaden the reach of the statute. Such a change is properly a matter requiring legislative, not judicial action. Nothing in this opinion should be read to limit the *insurance company's right of subrogation* with regard to any amount paid to the Edgars by defendant under the order of restitution. *People v. Daugherty,* 104 Ill.App.3d 89, 59 Ill.Dec. 807, 810, 432 N.E.2d 391, 394 (1982).

**8.** The Colorado legislature subsequently amended its restitution statute to include in the definition of victim parties "who have suffered losses

because of a contractual relationship." *See People v. Phillips,* 732 P.2d 1226 (Colo.Ct.App.1986).

**9.** Maryland's legislature has also amended its restitution statute to include insurers who have paid direct victims. *See Spielman v. State,* 298 Md. 602, 471 A.2d 730 (1984).

**10.** The Oregon legislature subsequently amended its restitution statutes to include restitution for those damages "which a person could recover against the defendant in a civil action arising out of facts or events constituting defendant's criminal activities," thus entitling an insurance company who has paid a loss to an insured to recover from the person who caused the damages. *See State v. Divers,* 51 Or.App. 351, 625 P.2d 681 (1981).

*Mathis,* 317 Pa.Super. 362, 464 A.2d 362 (1983); *State v. Fryer,* 496 N.W.2d 54 (S.D. 1993); *State v. Webb,* 151 Vt. 200, 559 A.2d 658 (1989).

## CONCLUSION

Gardiner's communications to the hospital chaplain were not "made privately," I.R.E. 505(a)(2), nor were they made in Aronen's "professional character as a spiritual advisor," I.R.E. 505(b). We therefore hold that the statements did not fall under the purview I.R.E. 505 and were properly admitted. We also conclude that the district court did not err in admitting the testimony of Loretta and William Gietler, as Gardiner did not object to and, indeed, opened the door to their testimony. Moreover, we conclude that the district court properly denied Gardiner's motions for acquittal and as well as his motion for reduction of sentence. Finally, we hold that Blue Cross is not a "victim," as defined by I.C. § 19–5304(1)(e), and that the district court therefore did not err in denying the state's motion for restitution to Blue Cross. Accordingly, the judgment of conviction and sentence and the district court's order denying restitution to Blue Cross are affirmed.

LANSING, J., concurs.

CAREY, Judge, pro tem., Concurring in part and dissenting in part.

I concur with the decision to affirm the judgment of conviction and to affirm the denial of the Rule 35 motion. I also concur that Blue Cross is not a "health care provider" for the purposes of awarding restitution.

I dissent from the majority opinion, however, to the extent that it holds that the subrogee of a named victim in a criminal case, having paid some or all of the victim's damages resulting from the defendant's criminal conduct, is not entitled to a judgment of restitution under I.C. § 19–5304.

It is patent that Blue Cross is subrogated to the rights of the victim in this case, because it paid $88,120.50 of the medical bills incurred by the victim as a direct result of the defendant's criminal conduct. Subrogation is a complete substitution of rights; the subrogee stands in the shoes of the subrogor. It has the same rights as the subrogor, and it is subject to the same burdens and limitations. *International Equipment Service, Inc. v. Pocatello Industrial Park Co.,* 107 Idaho 1116, 695 P.2d 1255 (1985).

Although a person who reimburses a victim of crime for economic loss is not specifically included in the definition of "victim" under I.C. § 19–5304(1)(e), the statute does provide that "The existence of a policy of insurance covering the victim's loss shall not absolve the defendant of the obligation to pay restitution." I.C. § 19–5304(2). Thus, in *State v. Fortin,* the Court of Appeals held that the trial court was correct in refusing to receive evidence that the victim of an aggravated DUI, who was awarded restitution of $12,975.00, had been covered by insurance. As the Court of Appeals noted, "... that the victim had received insurance benefits was irrelevant to the court's decision on restitution." *State v. Fortin,* 124 Idaho 323, 328, 859 P.2d 359, 364 (Ct.App.1993).

If an already-compensated victim may recover a judgment of restitution, it follows that the subrogee, who paid the victim's medical bills and who has the same rights, burdens and limitations as the subrogor-victim, should have the same right to claim restitution in the criminal proceeding as the victim in whose shoes it stands. This is the rule that has been adopted in the majority of American jurisdictions. *Hagler v. State,* 625 So.2d 1190 (Ala.App.1993); *State v. Steffy,* 173 Ariz. 90, 839 P.2d 1135 (App.1992); *Warzybok v. State,* 505 So.2d 507 (Fla.App.1987); *Rogers v. State,* 210 Ga.App. 164, 435 S.E.2d 457 (1993); *State v. Jola,* 409 N.W.2d 17 (Minn.App.1987); *State v. Brooks,* 116 N.M. 309, 862 P.2d 57 (App.1993); *People v. Chery,* 126 A.D.2d 659, 511 N.Y.S.2d 88 (1987); *LaFleur v. State,* 848 S.W.2d 266 (Tex.App. 1993); *State v. Stayer,* 706 P.2d 611 (Utah 1985); *Alger v. Commonwealth,* 19 Va.App. 252, 450 S.E.2d 765 (1994). There are a few jurisdictions that have reached a contrary conclusion. *People v. Williams,* 207 Cal. App.3d 1520, 255 Cal.Rptr. 778 (1989); *State v. Fryer,* 496 N.W.2d 54 (S.D.1993). There also are a few jurisdictions in which criminal restitution statutes expressly exclude insur-

ers from the class entitled to recover restitution.

The *Williams* case from California, cited by the majority, was not followed in the subsequent case of *People v. Foster*, 14 Cal. App.4th 939, 18 Cal.Rptr.2d 1 (1993). In an even more recent case, issued after an amendment to California law limiting restitution to "direct" victims of crime, a California court allowed restitution to be ordered in favor of an insured victim and left it to the victim and its insurer to work out repayment under the terms of their insurance contract. *People v. Sexton*, 33 Cal.App.4th 64, 39 Cal. Rptr.2d 242 (1995).

The majority opinion gives the criminal a windfall if the victim has had the foresight to obtain insurance and if the insurer promptly lives up to its responsibilities. This is especially true if the criminal declares bankruptcy, leaving the insurer with no viable civil remedy. The majority opinion also is contrary to the spirit, if not the letter, of I.C. § 19-5304(2), since it effectively "absolve[s] the defendant of the obligation to pay restitution." For the foregoing reasons, I would rule that Blue Cross is a "victim" for the purpose of restitution, and I would remand the case to the trial court to hold a restitution hearing.

Finally, even if the majority opinion is correct, it should be read only as a limitation on entry of a judgment of restitution under I.C. § 19-5304. It should not be read as a limitation on a trial court's discretion to impose restitution in favor of a third person as a condition of probation in an appropriate case.