PERRY, Judge Pro Tem.
Aristeo Gomez appeals from the judgment of conviction entered upon a jury verdict finding him guilty of lewd conduct with a minor under the age of sixteen, Idaho Code § 18-1508. He contends that the district court improperly admitted evidence relating to uncharged sexual misconduct. We affirm.
I.
FACTS AND PROCEDURAL BACKGROUND
In 2004, then fifteen-year-old V.B. was living with her mother, F.B., and her mother’s boyfriend,[1] Gomez, in Gomez’s house in Burley. While V.B.’s mother was gone on vacation, V.B. awoke early one morning to Gomez touching her, over her clothes, on her breasts, buttocks, and vagina. V.B. told him to stop, and Gomez offered her one hundred dollars, as well as some clothes, to sleep with *148 him. V.B. told Gomez to get out of her bedroom, and Gomez gave her twenty dollars, which V.B.’s mother had told him to give her, for both her and her brother, and then left the room. V.B. locked her door and went back to sleep. V.B.’s sixteen-year-old brother was sleeping in the same bed with her, but he did not wake up. V.B. did not wake her brother to tell him what had happened, nor did she tell anyone else about the incident because it was “embarrassing.” V.B. also stated that she did not tell her mother because Gomez had previously told V.B. that her mother would not believe her, that “no one would believe [her].”
Sometime after this incident, while V.B. was alone in her bedroom talking on the phone with her boyfriend, Gomez tried to get into her bedroom. V.B. told her boyfriend not to hang up on her. When her boyfriend inquired as to why he should not hang up, she related some concerns about Gomez and told him that Gomez was toying to get into her room. V.B.’s boyfriend told her brother about the incident, and her oldest sister, E.B., also learned what had happened. In January 2006, V.B. and her sisters met together and discovered that Gomez had sexually abused each of them. They approached their mother, F.B., with the allegations, and she told them they would talk about it later. F.B. testified at trial that she did not believe them. However, V.B. and her sisters went to E.B.’s residence where they called the police and submitted written statements regarding the abuse. Gomez was arrested and subsequently charged with lewd conduct with a minor under the age of sixteen.
Prior to trial, the State filed a notice of its intent to introduce evidence of other crimes, wrongs, or acts as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident pursuant to Idaho Rule of Evidence 404(b), attaching the written statements of V.B., as well as her sisters, E.B., M.A.R.B., S.B., and M.L.B. The statements indicated that Gomez had sexually abused V.B. and her sisters. The State filed a second notice of its intent to introduce Rule 404(b) evidence, attaching the written statement of C.G., a friend of V.B., as well as related police reports. Gomez filed an objection to the State’s intent to use Rule 404(b) evidence, as well as a motion in limine to exclude such evidence from trial.
At a hearing held on Gomez’s motion, he argued that the evidence was not relevant to any issue other than character or propensity and that its prejudice outweighed its probative value. The district court denied the motion, relying upon State v. Phillips, 123 Idaho 178, 845 P.2d 1211 (1993), but admonished the State that it would not be allowed to mention any uncharged sexual misconduct unless an offer of proof was made to the court as was required in the Phillips case. While the parties and the court indicated that a hearing would be held to entertain the State’s offer of proof, the record is unclear as to whether this occurred. Each of the State’s proposed witnesses included in the notices did, however, testify at trial regarding uncharged sexual misconduct.
In addition to testifying regarding the charged conduct, V.B. also testified that Gomez had touched her on her breasts, buttocks, and vagina on previous occasions. She stated that the touching began when she was about twelve or thirteen when Gomez and her mother were living in “Paul Housing.” She testified that she would spend the night there on weekends and during the summer. V.B. stated that, on one occasion, she was taking a shower and Gomez unscrewed the doorknob and tried to get into the bathroom. She also testified that Gomez would make inappropriate comments about her vaginal area, saying it was hairy; that he would walk around in a towel or his underwear; and that he would expose himself to her when he would get out of the shower.
Each of V.B.’s full sisters also testified regarding similar incidents occurring with Gomez. V.B.’s oldest sister, E.B., testified that Gomez abused her from the time she was twelve until she moved out of the house when she was approximately eighteen years old. She testified that the first incident occurred when her mother and Gomez were living in a house in Rupert. She stated, “[Gomez] grabbed me and hugged me really tight, and he told me that he wanted to be with me.” She testified that she understood *149 that to mean Gomez wanted to sleep with her. She also testified that she thought Gomez offered her money, but that she did not remember how much. She stated no one saw the incident because they were upstairs, and she did not tell anyone because she was embarrassed.
E.B. testified that while staying at the house in Rupert, Gomez would touch her in the middle of the night. She stated that, on one occasion, she woke up to him next to her in bed touching her breasts. She testified that she told Gomez to get out of her bed, and he “grabbed his private part ... and kind of showed it off and walked away.” She testified that her mother was sleeping in the bed next to her and her brothers and sisters were sleeping in the bed with her, but she was sleeping on the edge. She stated that she would sleep in between her siblings so that Gomez could not get to her, but that sometimes she would still sleep on the edge. She testified that the touching continued while in Rupert and then when her mother and Gomez moved to Paul Housing. E.B. stated that while in Paul Housing, she would often wake up to Gomez touching her, both over and under her clothing, on her breasts and between her legs. E.B. also testified that Gomez walked in on her while she was taking a shower and opened the curtain. Whenever E.B. threatened to tell her mother about Gomez’s actions, he would respond, “No, you’re not going to tell her.”
Another sister, M.A.R.B., who is approximately two years younger than E.B. and approximately two and one-half years older than V.B., also testified that Gomez abused her until she moved out of the house at the age of sixteen. She testified that Gomez “always tried to touch me” and related one incident where Gomez grabbed her breasts after her mother had left the house to sell tamales. She stated that on another occasion, she was sleeping on the side of the bed next to one of her siblings and awoke to find her pants and underwear pulled down from the front, and Gomez touching her. M.A.R.B. testified that when she told Gomez not to touch her, he asked where E.B. had gone. She told him to leave her alone, and he ultimately left. She testified that on another night, she and E.B. were asleep and she woke up to Gomez touching E.B.’s breast. M.A.R.B. also testified that Gomez watched her taking a bath through a hole in the door because the doorknob was missing. She stated that she never told anyone because it was embarrassing. M.A.R.B. also testified that she did not tell her mother about any of the incidents because Gomez told her he would say it was her fault and that she was lying.
S.B., V.B.’s younger sister, also testified that Gomez began abusing her when she was eleven or twelve, and that the first incident occurred when she was passing Gomez in the kitchen. S.B. stated that Gomez grabbed her and touched her, over the clothes, on her vagina when she walked by him. She testified that no one saw the touching and she did not tell anyone because she was embarrassed. S.B. also stated that she woke up early one morning to Gomez touching her. She testified that Gomez had pulled his pants down, as well as hers, and that he touched his penis against her vagina. She stated that she started to cry and he said, “Come on. I’ll give you $2.” She continued to cry, so Gomez got up, and she put her pants on and ran out. S.B. testified that Gomez had also touched her on other occasions and tried to get into the bathroom and grab her when she sent her sister to get a towel for her. S.B. testified that she told Gomez she was going to tell her mother, to which he responded, “Go ahead and tell her. She won’t ever believe you.”
M.L.B., V.B.’s youngest full sister, testified that Gomez abused her for the first time while she was watching television in the living room at the age of eleven. M.L.B. stated that Gomez came up to her while she was sitting on the couch and started grabbing her breasts and tried to touch her in between her legs. She stated that she told him to stop and then left to join her half-siblings outside. She testified that another incident occurred while she was sleeping in her mother’s room. She stated that she woke up to Gomez touching her, and she thought he had been touching her breasts and in between her legs because her bra and her pants were undone. She testified that her half-siblings were sleeping in the same bed, but they did not *150 wake up. M.L.B. also testified that Gomez came into the bathroom while she was taking a shower. M.L.B. also stated when she told Gomez that she was going to tell her mother, he told her that her mother would not believe her.
C.G., a friend of V.B.’s, also testified at trial. She testified that when she was thirteen or fourteen, she spent the night with V.B. at Gomez’s house in Burley. She stated that she was sleeping on a mattress with V.B. and woke up to Gomez touching her vagina over her clothing.
In addition to Gomez’s motion in limine to exclude Rule 404(b) evidence, he also requested a continuing objection prior to E.B.’s testimony. The court acknowledged the objection and stated that it would continue to overrule it based upon the Phillips opinion. However, the court did give a limiting instruction stating that the jury was not to infer a “pattern of behavior” from E.B.’s testimony, but that it went to V.B.’s credibility. Gomez again renewed his objection prior to the jury hearing testimony from M.A.R.B., S.B., and C.G., and prior to his cross-examination of M.L.B. The court gave a limiting instruction following each objection, generally instructing the jury that any other wrongs or acts, if believed, were not to be considered as evidence of Gomez’s character or any propensity to commit such acts and could only be used for the limited purposes of proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The jury was similarly instructed in the final jury instructions.
The jury found Gomez guilty of lewd conduct with a child under the age of sixteen. The district court entered a judgment of conviction and imposed a unified sentence of twenty years, with ten years determinate. Gomez appeals.
II.
ANALYSIS
Gomez contends that the district court erred by improperly admitting evidence of uncharged sexual misconduct in the form of testimony from E.B., M.A.R.B., S.B., M.L.B., and C.G.[2] He argues that the evidence was not relevant to a material and disputed issue other than propensity. Evidence of other crimes, wrongs, or acts is not admissible to prove a defendant’s criminal propensity. I.R.E. 404(b); State v. Johnson, 148 Idaho 664, 667, 227 P.3d 918, 921 (2010); State v. Winkler, 112 Idaho 917, 919, 736 P.2d 1371, 1373 (Ct.App.1987). However, such evidence may be admissible for a purpose other than that prohibited by I.R.E. 404(b). State v. Avila, 137 Idaho 410, 412, 49 P.3d 1260, 1262 (Ct.App.2002). In determining the admissibility of evidence of prior bad acts, the Supreme Court has utilized a two-tiered analysis. The first tier involves a two-part inquiry: (1) whether there is sufficient evidence to establish the prior bad acts as fact; and (2) whether the prior bad acts are relevant to a material disputed issue concerning the crime charged, other than propensity. State v. Grist, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009). Such evidence is relevant only if the jury can reasonably conclude the act occurred and the defendant was the actor. Id. We will treat the trial court’s factual determination that a prior bad act has been established by sufficient evidence as we do all factual findings by a trial court. State v. Parmer, 147 Idaho 210, 214, 207 P.3d 186, 190 (Ct.App.2009). We defer to a trial court’s factual findings if supported by substantial and competent evidence in the record. State v. Porter, 130 Idaho 772, 789, 948 P.2d 127, 144 (1997); Parmer, 147 Idaho at 214, 207 P.3d at 190. Whether evidence is relevant is an issue of law. State v. Atkinson, 124 Idaho 816, 819, 864 P.2d 654, 657 (Ct.App.1993). Therefore, when considering admission of evidence of prior bad acts, we exercise free review of the trial court’s relevancy determination. Id.
The second tier in the analysis is the determination of whether the probative value *151 of the evidence is substantially outweighed by unfair prejudice. Grist, 147 Idaho at 52, 205 P.3d at 1188. When reviewing this tier we use an abuse of discretion standard. Id. When a trial court’s discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. State v. Hedger, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).
A. Specific Articulation
Gomez contends that the district court did not make the required determination, as set forth in Grist, that there was sufficient evidence to establish the prior bad acts as fact. He argues that while a hearing was scheduled for the State to make its offer of proof, there is no record that such a hearing occurred and, as such, this Court cannot review whether the district court made the requisite finding. He asserts that the court erred because it failed to make the requisite finding on the record.
While Gomez argues that the court was required to make a specific finding, on the record, as to whether a jury could reasonably conclude that the prior acts occurred and that the defendant was the actor, such a procedure is not always required. This Court recently addressed a similar argument in Cooke v. State, 149 Idaho 233, 233 P.3d 164 (Ct.App.2010). In that case, this Court clarified that the district court is only required to make a specific articulation as to whether the prior conduct occurred if that question is squarely at issue. Cooke, 149 Idaho at 240, 233 P.3d at 171. If the question is at issue, a specific articulation is necessary for the determination of relevance. Id. Gomez did not argue below that the other crimes, wrongs, or acts did not occur; rather, he argued that they were not relevant to any issue other than propensity and that the prejudice of that evidence outweighed its probative value. As such, the court was never called upon to make a determination on the record as to whether the uncharged acts occurred. Therefore, the issue of whether the uncharged misconduct occurred was not before the district court, and no specific articulation was required.
B. Relevance
Gomez argues that because the district court did not have the benefit of Grist and Johnson, it erred by applying the wrong standard as set forth in State v. Phillips, 123 Idaho 178, 845 P.2d 1211 (1993). Gomez asserts that Phillips has been implicitly overruled because it relied exclusively upon State v. Moore, 120 Idaho 743, 819 P.2d 1143 (1991), and State v. Tolman, 121 Idaho 899, 828 P.2d 1304 (1992), which have been partially overruled by Grist and Johnson. The State contends that Grist and Johnson do not preclude admission of the testimony of Gomez’s other victims.
In Grist, the Idaho Supreme Court acknowledged that Moore and Tolman had sometimes been “interpreted as creating an exception in child sex cases to the prohibition of character evidence.” Grist, 147 Idaho at 51, 205 P.3d at 1187; see also Johnson, 148 Idaho at 668, 227 P.3d at 922. The Court held, however, that “admission of I.R.E. 404(b) evidence in a child sex ease is subject to the same analysis as the admission of such evidence in any other case.” Grist, 147 Idaho at 51, 205 P.3d at 1187. The Court further determined that “[ejvidenee of uncharged misconduct may not be admitted pursuant to I.R.E. 404(b) when its probative value is entirely dependent upon its tendency to demonstrate the defendant’s propensity to engage in such behavior.” Id. at 54, 205 P.3d at 1190.
Grist criticized the rationale set forth in Moore, stating that the Court’s explanation in that ease could have just as easily been stated as follows: “If the defendant has committed another sex offense, it is more probable that he committed the offense for which he is charged, thus reducing the probability that the prosecuting witness is lying, while at the same time increasing the probability that the defendant committed the crime.” Id. at 54, 205 P.3d at 1190. The unstated premise *152 in Moore was that “[i]f he did it before, he probably did it this time as well.” Id. Grist held that “[t]his complete reliance upon propensity is not a permissible basis for the admission of evidence of uncharged misconduct.” Id. Nevertheless, Grist declined to overrule Moore in its entirety, acknowledging that Moore correctly states: “Where relevant to the credibility of the parties, evidence of a common criminal design is admissible.” Grist, 147 Idaho at 54, 205 P.3d at 1190 (quoting Moore, 120 Idaho at 746, 819 P.2d at 1146).
While we recognize that Grist denotes a shift from Moore and its progeny, we do not read that case as prohibiting admissibility of prior bad act evidence entirely. Rather, the admissibility of evidence of prior bad acts hinges on the question of whether “its probative value is entirely dependent upon its tendency to demonstrate the defendant’s propensity to engage in such behavior.” Grist, 147 Idaho at 54, 205 P.3d at 1190 (emphasis added). If it is, the evidence is inadmissible as “complete reliance upon propensity evidence is not a pei’missible basis for the admission of evidence of uncharged conduct.” Id. (emphasis added). In other words, the fact that evidence of prior bad acts tends to demonstrate the defendant’s propensity to engage in such behavior does not necessarily preclude its admissibility. Although evidence of prior bad acts may tend to show a defendant’s propensity to commit a crime, such evidence may still be admissible under I.R.E. 404(b) if it is relevant for another purpose. See State v. Walker, 109 Idaho 356, 359, 707 P.2d 467, 470 (Ct.App.1985).
Evidence of an uncharged sex offense is relevant, and may be admissible, where it proves motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. See I.R.E. 404(b). Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” I.R.E. 401. Grist’s disapproving evaluation of Moore as stating that “[i]f the defendant has committed another sex offense, it is more probable that he committed the offense for which he is charged,” should not be read to eviscerate I.R.E. 401. As noted above, Grisi does not impose a blanket prohibition on all evidence of uncharged sex offenses. Rather, the import of Grisi is that the “Idaho Rules of Evidence require that trial courts treat the admission of evidence of uncharged misconduct in child sex crime eases no differently than the admission of such evidence in other cases.” Grist, 147 Idaho at 55, 205 P.3d at 1191.
Gomez contends that Phillips relied upon the “unstated premise” of Moore and, as such, the district court’s reliance on Phillips was in error. We need not address the continued validity of Phillips because we review questions of relevance de novo. See State v. Raudebaugh, 124 Idaho 758, 764, 864 P.2d 596, 602 (1993). Having reviewed the evidence with respect to the uncharged misconduct, we hold that it was relevant to prove opportunity and credibility. Nevertheless, because the parties raise several questions regarding the existence of a common scheme or plan, we first comment on its application to the facts of this case in light of recent Supreme Court decisions.
1. Common scheme or plan
Gomez’s primary argument on appeal is that the Idaho Supreme Court’s recent decisions in Grist and Johnson make clear that evidence that “a family member allegedly abused juvenile females, is irrelevant and inadmissible” as it does not demonstrate a common scheme or plan. He contends that following Grisi, evidence of similar age and circumstances is insufficient to show a common scheme or plan. He further claims that Johnson sets forth what the State must establish to admit prior bad acts involving family members.
In Johnson, the defendant was charged with molesting his daughter, and the State sought to introduce evidence of prior bad áets allegedly occurring with his sister when they were both juveniles. Johnson quoted language from Grist, where the Court held that prior uncharged sexual misconduct may be admissible “if relevant to prove ... a common scheme or plan embracing the commission of two or more crimes so related to *153 each other that proof of one tends to establish the other, knowledge, identity, or absence of mistake or accident.” Johnson, 148 Idaho at 668, 227 P.3d at 922 (quoting Grist, 147 Idaho at 54-55, 205 P.3d at 1190-91) (emphasis in original). Johnson explained the rule as follows:
In other words, at a minimum, there must be evidence of a common scheme or plan beyond the bare fact that sexual misconduct has occurred with children in the past. The events must be linked by common characteristics that go beyond merely showing a criminal propensity and instead must objectively tend to establish that the same person committed all the acts.
Johnson, 148 Idaho at 668, 227 P.3d at 922. The Johnson Court held:
The [trial] court identified the following characteristics that linked the current charged conduct to the prior bad acts to which [Johnson’s sister] testified: (1) both victims were about seven to eight years old; (2) both victims viewed Johnson as an “authority figure” because he was an older brother or father; (3) both courses of conduct involved Johnson requesting the victim to touch his penis. These similarities, however, are sadly far too unremarkable to demonstrate a “common scheme or plan” in Johnson’s behavior. The facts that the two victims in this case are juvenile females and that Johnson is a family member are precisely what make these incidents unfortunately quite ordinary. The prior acts are irrelevant and therefore inadmissible.
Johnson, 148 Idaho at 669, 227 P.3d at 923.
Gomez contends that this case is similar to Johnson because the allegation is that he, a family member, abused juvenile females, which, like Johnson, makes the alleged acts “unfortunately quite ordinary,” and, therefore, irrelevant and inadmissible. We note that Johnson does not set forth any particular or unique standard with respect to family members. Indeed, if prior instances of misconduct were inadmissible solely because they involved a family member abusing juvenile females, a great deal of relevant evidence might be excluded. In Johnson, the fact that the defendant had a random, isolated encounter with his sister when they were both juveniles bore no relevance on the alleged conduct against his daughter. In other words, the events were not “linked by common characteristics that go beyond merely showing a criminal propensity.” Johnson, 148 Idaho at 668, 227 P.3d at 922. As such, the evidence was inadmissible.
In this case we note that the specific factual allegations regarding the uncharged sexual misconduct with other victims rise above the “generalized similarities” warmed of in Johnson. The uncharged acts in this case do not involve unrelated, isolated instances of sexual misconduct from when Gomez was a juvenile, as was the ease in Johnson. The uncharged acts with other victims and the charged conduct relating to V.B. bear remarkable similarities. Nevertheless, because we conclude that the evidence is relevant for opportunity and credibility purposes, we need not determine whether they are “linked by common characteristics that go beyond merely showing a criminal propensity and instead ... objectively tend to establish that [Gomez] committed all the acts.”[3]
*154 2. Opportunity and credibility
In this case, the testimony of V.B.’s sisters and friend tended to prove that Gomez had the opportunity to commit the charged crime against V.B. Moreover, the testimony was relevant to V.B.’s credibility. The testimony elicited at trial indicated that V.B.’s biological parents had seven children together, and after V.B.’s mother and father were divorced, her mother, F.B., later had five children with Gomez.[4] From the time Gomez and F.B. started living together, they moved, incrementally, from a one-bedroom house to a four-bedroom house. In each of their residences, there were always several individuals living with them, consisting, at various times, of their own children, F.B.’s children (V.B. and her siblings), some spouses and children of F.B.’s children, and other relatives. Due to limited space, V.B. and her siblings often shared bedrooms, as well as beds. She testified that, while in the four-bedroom house in Burley, she often slept in the living room, but she also slept in and shared a room with her brother. She later shared the room with her sisters, S.B. and M.L.B., after they moved into the house. Gomez testified, and V.B. acknowledged, that there were as many as twelve people living in that house at various times.
With respect to the charged conduct, V.B. testified that the touching occurred while she was sleeping in her room and sharing a bed with her brother. Although apparently next to V.B. in bed while Gomez was touching her, her brother did not wake up and V.B. did not wake him up to stop Gomez or to tell him what had happened. V.B. testified that she thought her brother was working nights at that time and that was the reason he did not wake up. In spite of V.B.’s explanation, her testimony regarding this incident, by itself, raises issues of opportunity and credibility. Moreover, Gomez denied ever touching V.B. inappropriately. Based upon the nature of the charged offense and the surrounding circumstances in this case, opportunity and credibility were material and disputed issues concerning the crime charged.
Indeed, Gomez highlighted in his opening statement that the “essential point” of the whole case was “believability.” He argued it was unbelievable that he would go into V.B.’s room, touch her while her older brother slept next to her in the same bed, and talk to her in his regular voice, especially in a small home with so many people around. Gomez aggressively challenged the validity of V.B.’s testimony on cross-examination, and questioned whether he could have had the opportunity to abuse V.B. in the presence of so many people. Gomez argued in closing that V.B. testified the incident occurred in the morning, which meant there was “more chance that people are going to be walking around doing things.” He also argued that he (Gomez) would have to be the “stupidest man in the world” to “touch a 15-year-old girl” and “talk[] in his regular voice about offering her money about this, about clothes, things such as that while a 17-year-old boy is laying next to her.”[5] Gomez’s defense theory was essentially that it would have been impossible for him to abuse V.B. in a small house full of people, particularly with a sibling sleeping right next to her.
It is evident that the questions of whether Gomez had the opportunity to engage in a lewd act with V.B. and whether her account could be believed were squarely before the jury. While not addressing the question of “opportunity,” we find the Idaho Supreme Court’s decision in State v. Cardell, 132 Idaho 217, 970 P.2d 10 (1998), instructive in our analysis of this issue. In that case, the defendant was a masseuse accused of committing a sexual battery on a sixteen-year-old client. The girl reported that during the massage, Cardell had her disrobe and then *155 massaged her breasts and genital area and placed her hand near his groin. The district court allowed testimony from three former adult clients who described similar experiences. While the district court had focused on whether the testimony of the other massage clients tended to corroborate the testimony of the victim, the Court, reviewing the ease de novo, held that the testimony was relevant to prove the absence of mistake or accident. Cardell, 132 Idaho at 219-20, 970 P.2d at 12-13.
The Court noted that the “issue of whether Cardell deliberately touched [the victim’s] vaginal area was a material and disputed issue concerning the crime charged” because Cardell admitted to massaging the victim’s breasts and inner thighs, which would have resulted in touching the outside of the vaginal area, but he denied ever directly touching or massaging her vagina. Id. at 220, 970 P.2d at 13. The Court held:
The testimony of the adult massage clients was relevant to whether Cardell’s touching of [the victim’s] vaginal area was accidental. These women were asked at trial whether they believed that the touching of their vaginal areas by Cardell was accidental. The adult clients testified that they did not believe the touching was accidental during their massages. This testimony was relevant under I.R.E. 404(b) because it tends to show that any touching of [the victim’s] vaginal area by Cardell during massage therapy was not a mistake or accident, since other clients testified to similar touching.
Cardell, 132 Idaho at 220, 970 P.2d at 13 (emphasis added).
While absence of mistake or accident is not an issue in this case, evidence of “similar touching” of prior victims was allowed in Cardell to demonstrate that the touching of the victim, in that case, was not accidental. Similarly, evidence of instances involving “similar touching” of V.B.’s sisters and friend demonstrates that Gomez had the opportunity to engage in that type of touching under uniquely similar circumstances to the instant ease. At oral argument, counsel for Gomez conceded that opportunity was at issue in this case, but argued that V.B.’s sisters could have testified generally about Gomez’s ability to access her room and perhaps find her alone without testifying about their own encounters with Gomez. However, the relevance of their testimony was not only Gomez’s ability to access the room, but also his ability, in a house full of people, to surreptitiously enter V.B.’s bedroom, while she was sleeping next to her brother, to touch her and offer her money to sleep with him. Each of the girls was questioned at trial about how Gomez was able to get them alone. They testified that Gomez would capitalize on opportunities to catch the girls alone in a room, in the shower, or on the edge of a bed while everyone was sleeping. This testimony was necessary to explain how and why Gomez was able to abuse V.B. without anyone seeing the abuse, as her testimony, if considered alone, raised substantial questions as to how such abuse was possible in a house with little privacy. As stated in Grist: “Evidence of uncharged misconduct may not be admitted pursuant to I.R.E. 404(b) when its probative value is entirely dependent upon its tendency to demonstrate the defendant’s propensity to engage in such behavior.” Grist, 147 Idaho at 54, 205 P.3d at 1190. Here, as in Cardell, the testimony was not entirely dependent upon its tendency to demonstrate Gomez’s propensity to engage in lewd acts. Rather, it was relevant under I.R.E. 404(b) because it tended to show that Gomez seized the opportunity to secretly touch V.B.’s breast and genital areas while she was sleeping, since other individuals testified that he had exploited other opportunities to engage in similar touching.
C. Prejudice
Gomez contends that, even if relevant, the evidence of other uncharged sexual misconduct should have been excluded under I.R.E. 403. Specifically, he argues that the evidence was “highly prejudicial and extremely cumulative,” and that the jury was “overwhelmed with evidence of uncharged conduct,” which likely resulted in Gomez being considered as “a man of bad character.” The State responds that the district court did not abuse its discretion as it gave several limiting instructions instructing the jury on *156 the proper use of the evidence. A lower court’s determination under I.R.E. 403 will not be disturbed on appeal unless it is shown to be an abuse of discretion. State v. Enno, 119 Idaho 392, 406, 807 P.2d 610, 624 (1991); State v. Clark, 115 Idaho 1056, 1059, 772 P.2d 263, 266 (Ct.App.1989). When a trial court’s discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. Hedger, 115 Idaho at 600, 768 P.2d at 1333.
We recognize that the testimony of V.B.’s sisters and friend was prejudicial. However, it was also highly probative in light of the unique circumstances of the charged conduct. As noted above, V.B.’s testimony regarding the charged conduct, by itself, raised legitimate questions about V.B.’s credibility and whether Gomez would have had the opportunity to abuse her. As such, the testimony regarding uncharged acts of sexual misconduct was particularly probative in order to demonstrate that Gomez had the opportunity to abuse V.B. in spite of the presence of other people and the resultant lack of privacy. As trial counsel argued, the essential point of the case was believability, and the circumstances of this case are unbelievable. It is arguably unbelievable that Gomez would enter V.B.’s room, touch her while her brother was sleeping next to her in the same bed, and carry on a brief conversation with her. Thus, the testimony of V.B.’s sisters and friend was highly probative as to whether V.B. was telling the truth and whether Gomez had the opportunity to abuse V.B.
We also note that the risk of unfair prejudice was diminished as the district court gave a limiting instruction relative to each witness who testified about instances of uncharged sexual misconduct. See State v. Scovell, 136 Idaho 587, 591, 38 P.3d 625, 627 (Ct.App.2001) (holding that the risk of unfair prejudice was reduced by the trial court’s instruction that the jurors were not to consider the uncharged acts as proof that the defendant had criminal propensities or behaved in conformity with them by committing the charged crimes). In these instructions, the court consistently stated that the question before the jury was whether there was a touching of V.B., not of anyone else. The court also instructed the jury that any other wrongs or acts, if believed, were not to be considered as evidence of Gomez’s character or propensity to commit such acts and that they could only be considered for the limited purposes set forth in I.R.E. 404(b). When instructing the jury prior to the last Rule 404(b) witness’s testimony, the court stated: “I remind you that you can’t use these other incidents as a propensity to do something or that this was what [Gomez] did and, therefore, what he did to [V.B.] he did in accordance therewith.” The court similarly instructed the jury in the jury instructions. We presume that the jury followed the district court’s insti’uctions. See State v. Kilby, 130 Idaho 747, 751, 947 P.2d 420, 424 (Ct.App.1997); State v. Hudson, 129 Idaho 478, 481, 927 P.2d 451, 454 (Ct.App.1996).
In light of the highly probative nature of the testimony of uncharged sexual misconduct, as well as the district court’s repeated instructions to the jury regarding the proper uses of such testimony, we cannot say that the court abused its discretion in allowing V.B.’s sisters and friend to testify regarding instances of previous sexual misconduct. We conclude that the district court appropriately balanced the probative value of the evidence of uncharged misconduct against the risk of unfair prejudice, and that Gomez has failed to show an abuse of the trial court’s discretion.
III.
CONCLUSION
The testimony of V.B.’s sisters and friend was relevant to prove opportunity and credibility, and the district court did not abuse its discretion in admitting the evidence. Therefore, Gomez’s judgment of conviction for *157 lewd conduct with a minor child under sixteen is affirmed.
Judge MELANSON concurs.

. V.B.’s mother, F.B., testified that she and Gomez are married "[b]y the church,” but not by "the civil authorities.” V.B. and her sisters testifled variously that Gomez is their stepfather and/or their mother’s boyfriend.

. As part of his motion in limine, Gomez objected to the State’s intent to use Rule 404(b) evidence, including evidence of prior sexual misconduct with the victim, V.B. On appeal, however, Gomez only asserts that the district court erred by admitting the testimony of V.B.’s sisters and friend. As such, we need not address the admissibility of V.B.'s testimony regarding prior bad acts of Gomez.

. Moreover, while we need not address the admissibility of V.B.'s testimony with respect to prior uncharged sexual misconduct, we note that her testimony was relevant for several purposes, including opportunity, credibility, and common scheme or plan. See State v. Tapia, 127 Idaho 249, 256, 899 P.2d 959, 966 (1995) (concluding that testimony of other instances of abuse occurring after the charged conduct was relevant because it reflected the defendant’s common scheme or plan to use his girlfriend’s influence over the victim, who was her granddaughter, to compel her to have sexual intercourse with the defendant, as well as to show why the victim waited several months to report the abuse); see also State v. Scovell, 136 Idaho 587, 590, 38 P.3d 625, 628 (Ct.App.2001) (evidence of prior misconduct with victim regarding when and how the abusive behavior began allowed the jury to see the full picture, putting the victim’s testimony in context, as well as giving the jury the ability to assess whether the victim was fabricating her story or telling the truth); State v. Blackstead, 126 Idaho 14, 19, 878 P.2d 188, 193 (Ct.App.1994) (concluding that the uncharged criminal acts were in furtherance of an underlying plan to commit the charged crime where the uncharged act demonstrated a "continuing criminal design” to "groom” the victim by cultivating a relationship with her, inducing her into submission to his sexual demands, and procuring her silence through the use of drugs). In cases of sexual *154 abuse, evidence of prior sexual misconduct with the victim is particularly relevant where it demonstrates a progression of abuse, as the conduct actually charged may be only a part of the process.

. Their youngest child was born approximately one month before trial after Gomez had been arrested.

. V.B. testified that her brother was eighteen years old at the time of the preliminary hearing, but that he was sixteen years old and she was fifteen years old at the time of the charged conduct.